UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERT D. BERRY,

                          Plaintiff,

          -v-

INVESTIGATOR STANLEY MARCHINKOWSKI,
DETECTIVE CHARLES LOCKE, and JOHN and/or
JANE DOE,

                          Defendants.

---

Case No. 09-CV-4234 (KMK)

OPINION & ORDER

Appearances:

Robert D. Berry
Salt Point, NY
*Pro se Plaintiff*

Eva Lenore Dietz, Esq.
Rebecca Durie Katherine Culley, Esq.
Office of the New York State Attorney General
New York, NY
*Counsel for Defendant Investigator Stanley Marchinkowski*

David Lewis Posner, Esq.
McCabe & Mack LLP
Poughkeepsie, NY
*Counsel for Defendants Detective Charles Locke and John and/or Jane Doe*

KENNETH M. KARAS, District Judge:

        Pro se Plaintiff Robert D. Berry ("Plaintiff" or "Berry") brings this Action against

Defendants Investigator Stanley Marchinkowski ("Marchinkowski") and Detective Charles

Locke ("Locke") under 42 U.S.C. § 1983, alleging that Defendants falsely arrested and

maliciously prosecuted him.  Before the Court are Marchinkowski's and Locke's Motions for

Summary Judgment.  (Dkt. Nos. 126, 135.)  For the reasons explained herein, Defendants'

Motions for Summary Judgment are granted.

## I.  Background

### A.  Factual Background

#### 1.  Plaintiff's Contracting Business

Plaintiff was the owner and president of Independent Construction Services ("ICS"), a

construction company.  (Def. Locke's Rule 56.1 Statement ("Locke's 56.1") ¶ 1 (Dkt. No. 127);

Aff. of David L. Posner ("Posner Aff.") Ex. X (Robert Berry Deposition Transcript) ("Berry

Tr.") 23–24, 40–41 (Dkt. No. 129).)[1]  ICS would occasionally hire contract workers, including

Plaintiff's brother, Joseph Berry, and Gerrit Dodge.  (Locke's 56.1 ¶ 2; Berry Tr. 140–41.)

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (italics omitted), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible," *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. Mar. 12, 2012) (same).  Here, Defendants filed and served their statements pursuant to Rule 56.1, (Dkt. Nos. 127, 137), and filed and served statements notifying Plaintiff of the potential consequences of not responding to the Motions, as required by Local Rule 56.2, (Dkt. Nos. 128, 136).  Despite this notice, Plaintiff failed to submit a response to Defendants' 56.1 statements of facts.  Accordingly, the Court may conclude that the facts in Defendants' 56.1 Statement are uncontested and admissible.  *See Brandever*, 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in his Memorandum of Law, Plaintiff makes several statements about the facts of this case and appends several documents for the Court's consideration.  (Dkt. Nos. 143–47.)  Recognizing that pro se litigants are entitled to "special solicitude . . . when confronted with

Plaintiff obtained workers' compensation insurance for ICS through the New York State Insurance Fund ("NYSIF"). (Locke's 56.1 ¶ 3; Def. Stanley Marchinkowski's Statement Pursuant to Local Civ. R. 56.1(a) ("Marchinkowski's 56.1") ¶¶ 1–4 (Dkt. No. 137); Berry Tr. 63–68.)  Plaintiff was unable to pay the premiums for the insurance, went into arrears, and coverage was canceled on November 22, 2004. (Locke's 56.1 ¶ 4; Marchinkowski's 56.1 ¶ 4; Berry Tr. 63–69.)  Approximately three weeks before coverage was canceled, Plaintiff was sent a notice informing him that the insurance policy would be canceled as of November 22, 2004 unless he paid the amount in arrears, and that he would be ineligible to receive further policies from NYSIF until he paid the amount in arrears. (Marchinkowski's 56.1 ¶ 5; Posner Aff. Ex. B (Notice of Cancellation) (informing Berry that "[t]o prevent [his] policy from being cancelled, [he] must pay the amount due before 12:01 a.m. on the effective date of the cancellation" and that "[a]n employer, whose policy of insurance has been cancelled by the State Insurance Fund for non-payment of premium, is ineligible to contract a subsequent policy of insurance with the State Insurance Fund while the billed premium on the cancelled policy remains uncollected."

---

motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court considers the statements and documents in Plaintiff's opposition papers to determine if there are any material issues of fact based on the evidence in the record.  *See Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) (italics omitted) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (internal quotation marks omitted)); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response).  However, many of the factual assertions in Plaintiff's opposition papers either do not contain citations to the record, or are not supported by the citations in the record. The Court disregards all such assertions.  Finally, for ease of reference, the Court cites to Defendants' 56.1 Statements when the facts are not in dispute.

(internal quotation marks omitted)); Berry Tr. 67–69 (confirming he received this notice).)

Plaintiff claims he did not pay any of the money he owed because he could not afford to do so.

(Berry Tr. 67–69.)[2]

In July 2005, Plaintiff "prepared an estimate for a large renovation project" at the home

of his friend Lisa Alexander ("Alexander"), which would cost $83,400.  (*See* Locke's 56.1 ¶ 5;

Marchinkowski's 56.1 ¶¶ 6, 26; Berry Tr. 83–85; Posner Aff. Ex. C (July 5, 2005 Berry Estimate

for Alexander).)  The estimate was on Plaintiff's letterhead, and provided the following contact

information: "Washington Hollow Plaza Suite 11-126, Salt Point, New York 12578;"

"OFFICE/FAX (845) 677-8768;" "CELL (845) 527-6759."  (Posner Aff. Ex. C (July 5, 2005

Berry Estimate for Alexander).)  At the time he prepared the estimate, Plaintiff did not have

workers' compensation insurance, but he claims that he did not believe it would be necessary

since he thought that Alexander could get the insurance policy for the project.  (Berry Tr. 84–

87.)  However, Alexander's home was in the City of Beacon, which required that "proof of

compensation insurance be submitted in order to obtain a building permit."  (Locke's 56.1 ¶ 6;

Berry Tr. 88.)

## 2.  Transfer of ICS Ownership to Janet Berry

In August 2005, Plaintiff transferred his shares in ICS to his mother, Janet Berry.

(Locke's 56.1 ¶ 7; Marchinkowski's 56.1 ¶ 7; Posner Aff. Ex. Y (Deposition of Janet Berry)

("Janet Berry Tr.") 5, 28–29.)  Janet Berry worked primarily doing administrative office work at

---

[2] The Notice states that Plaintiff owed $22,607.02, but Plaintiff disputes that amount, stating that he owed $13,000 to $14,000.  In any event, he admits that he did not pay the amount he says that he owes, (*see* Berry Tr. 67–69), and the exact amount owed is not material.  It is also notable that in his bankruptcy proceeding, Plaintiff represented that he owed NYSIF $24,429.46. (*See* Robert D. Berry's Opp'n to Stanley Marchinkowski Mem. of Law in Supp. of Summ. J. ("Pl.'s Mem. in Opp'n to Marchinkowski") Ex. D (Discharge of Debtor), at 15 (Dkt. No. 143).)

a retirement community, did not have prior business or construction experience, and did not give any consideration for the transfer of stock.  (*See* Locke's 56.1 ¶¶ 8–9; Marchinkowski's 56.1 ¶ 8; Janet Berry Tr. 20–22, 31–36, 77–79.)  She accepted the transfer because she did not want her "boys to be out of work and because Robert was not able to at that time get his own insurance." (Locke's 56.1 ¶ 10 (internal quotation marks omitted); Janet Berry Tr. 36 ("Q:  So why did Mr. Berry transfer the[] [stock] to you?  A:  Because the business—I did not want to see either one of my boys out of work and because he was not able to, at that point, get the insurance I asked him if it would be possible for me to take over the company and pay the insurance.").)  Plaintiff "acknowledges that the transfer of the stock to his mother was so that ICS could get workers' compensation insurance for the Alexander renovation project."  (Locke's 56.1 ¶ 11; *see also* Berry Tr. 89 ("Q:  So that transfer happened so that ICS could get Worker's Compensation insurance for the Alexander Project, correct?  A:  Yes."); Janet Berry Tr. 70–71 ("Q:  . . . And, you chose to do it because you needed proof of ownership?  A:  That's correct.  Q: And, you needed proof of ownership to be able to submit the application to NYSIF in your name as the owner; correct?  A:  That's correct.  Q:  And the application had to be in your name because Mr. Berry had an outstanding balance with NYSIF; right?  A:  He couldn't get insurance obviously because of the outstanding balance.").)

Plaintiff "remained the President of ICS after the transfer of stock ownership to his mother and his duties remained the same."  (Locke's 56.1 ¶ 12; *see also* Berry Tr. 94–95.)  Indeed, Plaintiff and his mother did not discuss Janet Berry's responsibilities with the company, and Janet's responsibilities before and after the transfer were the same: writing contracts and estimates based on information provided to her by Plaintiff.  (Janet Berry Tr. 39, 85–86; *see also* Locke's 56.1 ¶¶ 13–14; Janet Berry Tr. 98 ("Q:  You weren't going to work at this company?

A: No.  Q: You weren't going to make any money at this company; correct?  A: That's correct.

Q: This was a vessel so your sons could work, it was their business, correct, or Robert's

business and he employed your other son; correct?  A: Yes.").)

     Approximately two weeks after being transferred ownership of ICS, on September 1,

2005, Janet Berry went with Plaintiff to the Whalen Insurance Agency to apply for workers'

compensation insurance for ICS.  (Locke's 56.1 ¶ 15; Berry Tr. 95–100.)  They met with

insurance agent Leslie Brussel-Smith ("Brussel-Smith"), (Locke's 56.1 ¶ 17; Posner Aff. Ex. F

(Statement of Leslie Brussel-Smith); *see also* Berry Tr. 95–96), who advised them that there

might be problems with the application because of Plaintiff's involvement in ICS and his

outstanding financial obligations to NYSIF, (Locke's 56.1 ¶ 19; Berry Tr. 101–02; Posner Aff.

Ex. F (Statement of Leslie Brussel-Smith)).  There is some dispute about who said and did what.

In December 2006, Brussel-Smith provided a sworn statement to the Dutchess County Sheriff's

Office, which stated:

> I told them that there would be potential problems with the application due to
> Robert's financial obligation to the New York State Insurance Fund and the fact
> that his mother is now applying for Insurance.  I told him that due to these issues I
> believed that the application would be declined, but he insisted that it be submitted.

(Posner Aff. Ex. F (Statement of Leslie Brussel-Smith).)  Plaintiff, however, testified that he did

not ask Brussel-Smith to submit the application despite the potential problem, that he did not

insist that the application be submitted, that Brussel-Smith just submitted the application, and

that while Brussel-Smith stated that there might be a problem with it, she did not tell him that she

thought it would be denied.  (Berry Tr. 102–04.)  Similarly, Janet Berry testified that she recalled

Brussel-Smith saying "something like, 'this might not go through,'" not that she believed it

would be denied, and that she "[did] not recall [Plaintiff] insisting on anything."  (Janet Berry Tr.

54–55.)  More generally, Plaintiff testified that, while he was present during the meeting between

his mother and Brussel-Smith, he was not paying attention to what was said and the information

for the application was provided by his mother, not him.  (Berry Tr. 107–11.)

The application ultimately submitted on behalf of Janet Berry (and Plaintiff) contained

several misstatements.  First, the application listed the date of incorporation of ICS as August 8,

2005, and stated that ICS had been in existence for one month, (Marchinkowski's 56.1 ¶ 10;

Posner Aff. Ex. E (Janet Berry's Application for New York Workers' Compensation and

Employers' Liability Insurance), at 4); however, ICS was incorporated in May 1997,

(Marchinkowski's 56.1 ¶ 10; Berry Tr. 37, 108 (testifying that he incorporated ICS in May

1997)).  Additionally, the application asked, "HAVE YOU EVER BEEN INSURED IN THE

NEW YORK STATE INSURANCE FUND?" and instructed that

> You must answer "YES" if you or any person who directly or indirectly owns or
> controls or is the president, vice president, secretary or treasurer of [ICS] either
> directly or indirectly owns or controls or is president, vice president, secretary or
> treasurer of an employer that has had a workers' compensation policy with the State
> Insurance Fund that was cancelled, or directly or indirectly owned or controlled or
> was president, vice president, secretary or treasurer of an employer at the time that
> employer's workers' compensation insurance policy with the State Insurance Fund
> was cancelled.  The Workers' Compensation Law prohibits any person from
> contracting for a subsequent policy with the State Insurance Fund while the billed
> premium on such a cancelled policy remains uncollected.

(Posner Aff. Ex. E (Janet Berry's Application for New York Workers' Compensation and

Employers' Liability Insurance), at 3.)  In response to this question, the box for "no" was

checked.  (*Id.*)  In his deposition, Plaintiff admitted that the statement was incorrect.  (Berry Tr.

109–10.)[3]

---

[3] Remarkably, Plaintiff asserts that these misstatements were due to misunderstandings
by Janet Berry.  (Pl.'s Mem. in Opp'n to Marchinkowski 6; Janet Berry Tr. 103–04.)

Additionally, because the page numbers listed at the bottom of Plaintiff's Memorandum
start over after page 19, the Court will cite to this document using the ECF page numbers at the
top of each page.  (*See* Dkt. No. 143.)  The Court will use the same convention for Plaintiff's
Memorandum of Law in Opposition to Locke.  (*See* Dkt. No. 145.)

The application was rejected one week after its submission by letter received on September 12, 2005, because of ICS's indebtedness to NYSIF and Plaintiff's involvement in ICS. (Locke's 56.1 ¶ 20, 22; *see also* Berry Tr. 95–104, 116; Janet Berry Tr. 49–57; Posner Aff. Ex. F (Statement of Leslie Brussel-Smith); Posner Aff. Ex. H (Rejection Letter dated September 7, 2005) (stating "[w]e are unable to provide you with a quote or insurance at this time because of the following reason(s): Pursuant to Section 93 of the Workers' Compensation Law, our records indicate that you owe premium on the . . . policy," and indicating that Robert D. Berry owed $25,332.75 on policy number 13526512).)

### 3.  Desormier Contractors

Marcia Rose ("Rose"), whose maiden name is Desormier, was Plaintiff's live-in girlfriend at the time of the events in question. (Locke's 56.1 ¶ 23; Marchinkowski's 56.1 ¶ 12; Berry Tr. 7, 14 (stating that he lives with Rose and that they began dating in 2004 or 2005 and that they began living together full-time in approximately 2006); Janet Berry Tr. 81 (stating that, by the time of the deposition, Rose and Plaintiff had lived together for seven to eight years); Dep. of Marcia Rose ("Rose Tr.") 234 (testifying that, at the time Rose formed Desormier Contractors, she was living with Plaintiff); *see also* Rose Tr. 9 (testifying that Desormier is Rose's maiden name, Rose is her married name, and that though she is no longer married she never changed her name back).)[4]  After Janet Berry's insurance application was denied, Plaintiff

---

[4] The transcript of Rose's deposition is excerpted in several locations. (*See* Decl. of Eva Dietz Ex. 3 (Dkt. No. 139); Aff. of Robert Berry Ex. 5 (Dkt. No. 144); Aff. of Robert Berry Ex. 5 (Dkt. No. 146); Reply Decl. of Eva Dietz Ex. 1 (Dkt. No. 154).)

The Court notes that while Locke's Rule 56.1 statement refers to the Rose deposition transcript as Exhibit Z, it is not actually attached to Locke's papers. Therefore, where Locke's Rule 56.1 statement refers to pages of the Rose transcript included in Marchinkowski's or Plaintiff's papers, the Court relies on the transcripts attached by the other Parties. However, where Locke's Rule 56.1 statement cites to pages of the Rose transcript not in the record, the Court disregards those assertions. *See* Local Civ. R. 56.1(d).

and Janet Berry, in the presence of Rose, discussed the fact that Plaintiff would have to cancel the contract with Alexander because he did not have insurance coverage.  (Locke's 56.1 ¶ 24; Berry Tr. 121–23; Janet Berry Tr. 106–07.)  Plaintiff claims that Rose then asked if she could open her own business.  (Berry Tr. 123; Janet Berry Tr. 106–07.)  Plaintiff contends that the idea behind opening her own business was that Rose, who was also friends with Alexander, could take over the Alexander contract, and then Berry could work for Rose.  (Marchinkowski's 56.1 ¶ 14; Locke's 56.1 ¶¶ 25–26; Berry Tr. 124, 249, 269; *see also* Rose Tr. 64, 72, 79, 122.) Plaintiff emphasizes that Rose wanted to open the business as an opportunity for her to "make a little extra money."  (Robert D. Berry's Opp'n to Charles Locke's Mem. of Law in Supp. of Summ. J. ("Pl.'s Mem. in Opp'n to Locke") 6 (Dkt. No. 145) (internal quotation marks omitted); *see also* Rose Tr. 62.)

On September 14, 2005, a day before Desormier filed a d/b/a certificate with the Dutchess County Clerk, and two days after receiving the letter denying his mother's insurance application, Plaintiff and Rose went to the Whalen Agency and met with Brussel-Smith to apply for workers' compensation insurance.  (Locke's 56.1 ¶¶ 35, 41; Marchinkowski's 56.1 ¶ 16; Berry Tr. 129–31; Rose Tr. 75–76; Posner Aff. Ex. J (Marcia Rose NYSIF Application); Decl. of Stanley Marchinkowski ("Marchinkowski Decl.") Ex. D (Application Cover Letter) (Dkt. No. 141); *see also* Posner Aff. Ex. O (Desormier Contractors Business Certificate dated September 15, 2005).)  Rose's application, like Janet Berry's application, checked the box "no" to the question, "HAVE YOU EVER BEEN INSURED IN THE NEW YORK STATE INSURANCE

FUND?" (Posner Aff. Ex. J (Marcia Rose NYSIF Application), at 3.)[5]  That application, like

Janet Berry's, contained the instruction:

> You must answer "YES" if you or any person who directly or indirectly owns or
> controls or is the president, vice president, secretary or treasurer of [Desormier
> Contracting] either directly or indirectly owns or controls or is president, vice
> president, secretary or treasurer of an employer that has had a workers'
> compensation policy with the State Insurance Fund that was cancelled, or directly
> or indirectly owned or controlled or was president, vice president, secretary or
> treasurer of an employer at the time that employer's workers' compensation
> insurance policy with the State Insurance Fund was cancelled.  The Workers'
> Compensation Law prohibits any person from contracting for a subsequent policy
> with the State Insurance Fund while the billed premium on such a cancelled policy
> remains uncollected.

(*Id.* at 3.)  Like Janet Berry, Rose answered "no" to that question.  (*Id.*)  Rose paid the $1,000

deposit with a check from her personal account, (Marchinkowski's 56.1 ¶ 19; Rose Tr. 84), but

Plaintiff reimbursed Rose for the $1,000.  (Marchinkowski's 56.1 ¶ 19; Rose Tr. 85.)  NSYIF

granted Desormier's application for insurance by letter dated September 23, 2005.

(Marchinkowski's 56.1 ¶ 20; Locke's 56.1 ¶ 35; Rose Tr. 85–86; Posner Aff. Ex. K (Approval

Letter Addressed to Marcie Rose d/b/a Desormier Contracting).)

On September 26, 2005, Plaintiff filled out and submitted a building permit application to

the City of Beacon for the Alexander project, relying on the proof of insurance for Desormier

Contracting.  (Marchinkowski's 56.1 ¶ 21; Berry Tr. 134–35; Marchinkowski Decl. Ex. F

(Building Permit Application).)  In his permit application, Berry estimated the cost of the project

to be $83,000 plus fees of $460, which was almost identical to the estimate of $83,400 provided

to Alexander on July 5, 2005.  (*See* Marchinkowski Decl. Ex. F (Building Permit Application), at

unnumbered 2; Posner Aff. Ex. C (July 5, 2005 Berry Estimate for Alexander).)  Berry then

---

[5] Locke's Rule 56.1 statement asserts that Rose did not sign the application because the
signature states "Marcy Rose" and Rose always spells her name Marcie, not Marcy.  (Locke's
56.1 ¶¶ 37–39.)

drafted a scope of work for the Alexander project on Desormier's letterhead, which provided for the completion of the same work as did the July 5 estimate prepared by Berry. (Marchinkowski's 56.1 ¶ 22; Rose Tr. 123–24.)

The Alexander project, which was managed by Plaintiff, was *the only project* undertaken by Desormier Contracting.  (Locke's 56.1 ¶ 43; Marchinkowski's 56.1 ¶ 23; Berry Tr. 141; Rose Tr. 120–22.)  The project began in September 2005 and was completed roughly in March or April of 2006.  (Marchinkowski's 56.1 ¶ 23; *see also* Berry Tr. 139, 144–45; Rose. Tr. 131.) Desormier was in business for the same period, as it was formed in September 2005, and went out of business in April 2006.  (Marchinkowski's 56.1 ¶ 24; Rose Tr. 41–42; 60–61.)

At the time of the formation of Desormier Contractors, Rose had no prior experience in business or construction.  (Locke's 56.1 ¶ 28; Rose Tr. 59–60.)  She made no investment in the business, and the business did not purchase any equipment or supplies, but rather used those belonging to Plaintiff, free of charge.  (Locke's 56.1 ¶ 30–31; Marchinkowski's 56.1 ¶ 31; Rose Tr. 93–94, 236.)  Desormier Contractors only used workers who had previously worked for Plaintiff or ICS.  (Locke's 56.1 ¶ 33; Marchinkowski's 56.1 ¶ 31; Berry Tr. 140–41, 145; Rose Tr. 112–14.)  Desormier's letterhead, designed by Plaintiff, contained Plaintiff's name and his cell phone number, but not the name or cell phone number of Rose; additionally, the office and fax number listed were the same as those previously listed for Plaintiff's business and corresponded to an empty apartment in Plaintiff's parents' home.  (Marchinkowski's 56.1 ¶ 30; Rose Tr. 95–97, 126–128; 136–37; Marchinkowski Decl. Ex. F (Building Permit Application); Posner Aff. Ex. P (Desormier's Scope of Work for Alexander) (stating, as part of the letterhead, Desormier Contractors, Robert D. Berry, Office/Fax: (845) 677-8768, Cell (845) 527-6759); Posner Aff. Ex. C (July 5, 2005 Berry Estimate for Alexander) (stating, as part of the letterhead,

Robert D. Berry, Office/Fax (845) 677-8768, Cell (845) 527-6759).)  Plaintiff's name was on Desormier Contractors' checking account, and the bank statements were sent to Plaintiff's personal PO Box.  (Locke's 56.1 ¶ 34; Marchinkowski's 56.1 ¶ 29; Rose Tr. 99–100, 173–76.) Plaintiff paid personal obligations from Desormier's account, such as child support to his ex-wife, rent payments to his ex-wife's landlord, and payments to his personal attorney.  (Locke's 56.1 ¶ 53; Marchinkowski's 56.1 ¶ 33; Berry Tr. 270–72; Rose Tr. 182–84, 187–88.)[6] Furthermore, Plaintiff continued to use the account after the company went out of business. (Marchinkowski's 56.1 ¶ 33; Berry Tr. 170–71.)  Desormier's records were kept by Berry in the same ledger book he previously used for ICS.  (Marchinkowski's 56.1 ¶ 32; Berry Tr. 161–64, Rose Tr. 169, 192–94.)  Rose had no duties or responsibilities in connection with Desormier; Plaintiff operated the business and his responsibilities with respect to Desormier were the same as those when he operated his own company.  (Marchinkowski's 56.1 ¶ 28; Berry Tr. 142, 269; Rose Tr. 81, 111–12, 175–176, 243–45.)

### 4.  The Froman Project

On or around September 7, 2005, before Desormier was formed, Plaintiff was hired by Ann Froman ("Froman") and her husband Rodney P. Silvernail ("Silvernail") to build an art studio for Froman.  (Marchinkowski's 56.1 ¶ 27; Berry Tr. 145–46; Marchinkowski Decl. Ex. I (Typed Sworn Statement of Rodney Silvernail).)  When Plaintiff learned that he would need workers' compensation insurance, he suggested that Froman hire Desormier so that he could do the work as its employee, although Plaintiff admits he did not work on the project as part of

---

[6] At his deposition, Plaintiff insisted that Rose told Plaintiff to make these personal payments from Desormier's account, (Berry Tr. 271–72), though he offered no explanation as to why she would make that suggestion.  Interestingly, when Rose was asked why Plaintiff used the Desormier account to make the payments to his ex-wife, she said that Defendants' counsel would "have to ask [Plaintiff]."  (Rose Tr. 182–83.)

Desormier.  (Marchinkowski's 56.1 ¶ 27; Berry Tr. 145–49; *see also* Rose Tr. 136 ("Q:  Did

Desormier Contractors ever work on any project for Ann Froman?  A:  No.").)  Froman agreed,

and Berry provided her with proof of insurance for the Froman project, listing Desormier as the

policyholder.  (Marchinkowski's 56.1 ¶ 27; Marchinkowski Decl. Ex. G (Certificate of Workers'

Compensation Insurance).)

     Froman and Silvernail both provided sworn handwritten statements to the police in 2006,

which were later typed, with some changes, and signed again.  Silvernail's typed statement,

which he signed on October 31, 2006, states the following:

> I hired Robert Berry as an employee and he worked for me for about 4 months.
> During the time Robert Berry worked for me I had a conversation with him about
> another project, the construction of an art studio for my wife Ann Froman.  Robert
> Berry agreed to due [sic] the project but I told him he would need his own workers
> comp insurance.  Robert told me he now had insurance under I. C. S. and had me
> make payment to him for the remainder of the spec house work to that name.  The
> insurance I was then told changed to Marcie Rose Deso[r]mier Contracting.  Robert
> Berry told me he could not get the insurance in his name due to the bad debit [sic].
> I didn't pay attention or question the fact that the certificate was in the name of
> Desormier Contracting.  The art studio was my wife's project.  I fired Robert Berry
> about this same time due to the quality of work he had performed on my spec home.
> No work was ever performed on my wife's studio even though Robert Berry cashed
> the checks totaling $15.000.00 (fifteen thousand dollars).  My wife has contacted
> the New York State Attorney General's office and was sent a packet of forms to fill
> out and return as of this time my wife has not returned the forms.

(Marchinkowski Decl. Ex. I (Sworn Statement of Rodney Silvernail).)  Silvernail's handwritten

statement, which he signed on October 20, 2006, contained the same material facts as his typed

statement.  The handwritten statement states:

> I became acquainted with Robert Berry through his brother, Joe Berry.  Joe stated
> that his brother Robert Berry was out of work.  I am a contractor in northern
> Dutchess County and needed a worker to help me complete a house I was building.
> I hired Robert Berry as an employee in August at 2005, at first I was looking for a
> person with his own comp coverage.  Mr. Berry stated that he was a contractor but
> did not have insurance at that time due to cancellation due to bad debit [sic].  I hired
> Robert Berry and he worked for about four months, firing him in October 2005.  He
> was fired for not completing work and doing work that was not up to code.  During

the period of time Robert Berry worked for me I had a conversation with him regarding another project, the construction of the Ann Froman Studios which [unintelligible] my wife Ann Froman.  Robert Berry agreed to do the project.  I advised him he needed to show me proof of insurance, he told me he had insurance under I.C.S. which changed to Marcie Rose DBA Desormier Contracting.  He told me he could not get the insurance due to his bad debit [sic] in his own name and would get it in his mothers [sic] name.  I didn't pay attention that the certificate of Insurance was in the name of Desormier Contracting.  The project Ann Froman Studio's [sic] was my wife's project for which my wife wrote checks totaling $15,000.00.  No work was performed on the project but Robert Berry cashed the checks.  My wife has since contacted the New York State Attorney General Office [sic] to assist with recovery of the funds.  The New York State Attorney's General's Office [sic] to this date has only sent my wife a packet of paperwork to be filled out and returned.  My wife has not done this as of this time.

(Robert D. Berry's Opp'n to Stanley Marchinkowski's Mem. of Law in Supp. of Summ. J.

("Pl.'s Mem. in Opp'n to Marchinkowski") Ex. L (Handwritten Sworn Statement of Rodney

Silvernail) (Dkt. No. 143).)  Froman's typed statement, signed on October 31, 2006, stated:

> I became acquainted with Robert Berry through my husband Rodney Silvernail.  Robert Berry was working for my husband finishing work on a spec house.  Robert Berry was going to be hired to build my art studio when he was finished working on the spec house.  On September 7, 2005 I gave Mr. Berry a check for $10,000.00 (Ten Thousand Dollars) as a deposit for the project.  I then gave Mr. Berry an additional check for $5,000.00 (Five thousand Dollars) on September 27, 2005 toward the project.  Robert Berry supplied an insurance certificate to show he had the proper coverage to due [sic] the project this was needed because he would not be an employee but would be the contractor on this job.  Shortly after Robert Berry received the money my husband became dissatisfied with his work on the spec home and was fired.  Robert Berry never returned the money I paid him for the art studio.  Robert Berry did however place a mechanics lien for $15,000.00 (Fifteen Thousand Dollars) on the spec house that he had worked on for my husband.

(Pl.'s Mem. in Opp'n to Marchinkowski Ex. O, at unnumbered 3.)  Her handwritten statement,

signed on October 20, stated:

> I got to know Robert Berry through my husband Rodney Silvernail.  He was working for my husband (Rodney Silvernail) building a ho[u]se.  He was going to be hired to build my art studio when he was finished building the house.  As a deposit to get Mr. Robert Berry to build my art studio I gave him a check on Sept. 7, 2005 for $10,000 and another check on September 27, 2005 for $5,000.  Shortly after I wrote the checks to Mr. Robert B[e]rry my husband became dissatisfied with Mr. Robert B[e]rry's work he was doing on his house project.  My husband then

> fired Mr. Robert B[e]rry.  Mr. Robert B[e]rry never returned the money I paid him for the art studio.  Mr. B[e]rry then put a mechanics lien on the house he was building for my husband.  Mr. Robert B[e]rry did not actually build the house.  It was a modular home and he assisted i[n] finishing it.

(*Id.* at unnumbered 1.)

### 5.  Marchinkowski's Investigation

In February 2006, Russell DeForest ("DeForest"), a NYSIF auditor, conducted a routine audit of Desormier.  (Marchinkowski's 56.1 ¶ 37; Berry Tr. 152–54; Marchinkowski Decl. ¶ 5.) DeForest had previously conducted an audit of Berry in connection with his prior policy. (Marchinkowski's 56.1 ¶ 38; Berry Tr. 154; Marchinkowski Decl. ¶ 6 & Exs. M, O.)  Plaintiff met with DeForest on behalf of Desormier in February and October 2006 in connection with the audit of Desormier.  (Marchinkowski's 56.1 ¶¶ 34, 37; Berry Tr. 152–56; Marchinkowski Decl. ¶ 6.)  Plaintiff supplied Desormier's books and records to DeForest, even though the company was supposed to be run by Rose.  (*See* Marchinkowski's 56.1 ¶ 35; Berry Tr. 152–56.)

After his meetings with Plaintiff, DeForest made a fraud referral.  (Marchinkowski's 56.1 ¶ 40; *see also* Marchinkowski Decl. Ex. B (Division of Confidential Investigations Investigation Request).)  That referral stated:

> Robert Berry's SIF policy was cancelled 11/22/04 and he ow[e]s SIF $24,000.  It now appears as if he is doing business under [Desormier's policy].  Invoices are in the nam[e] of Robert Berry.  Payments are made to R. Berry Desormier Contracting.  Marcie Rose is Robert Berry's girlfriend.  They live together at 55 Front St.  Robert Berry is paid as casual labor by Marcie Rose."

(Marchinkowski Decl. Ex. B (Division of Confidential Investigations Investigation Request).) This investigation was assigned to Marchinkowski in or around April 2006.  (Marchinkowski's 56.1 ¶ 41; Marchinkowski Decl. ¶¶ 3–4 (explaining that cases are randomly assigned between the three investigators in Albany and that he was assigned to investigate the Berry fraud referral).)

Marchinkowski looked up Plaintiff's and Desormier's policies in the NYSIF database, and saw that there were outstanding balances on both policies. (Marchinkowski's 56.1 ¶ 42; Marchinkowski Decl. ¶ 9; *see also* Marchinkowski Decl. Ex. C (Printouts from the NYSIF System).) Marchinkowski also determined the following: that Desormier's application listed the company's address as 55 Front Street, the same address that Plaintiff lived at, that Desormier's application denied having previous coverage, and that Desormier's application was submitted by the same agency that submitted Plaintiff's application. (Marchinkowski's 56.1 ¶¶ 43–45; Marchinkowski Decl. ¶¶ 10–12.)

Marchinkowski also reviewed documents provided to DeForest during the audit. (Marchinkowski's 56.1 ¶ 46; Marchinkowski Decl. ¶ 13; Ex. F (attaching the documents provided during the audit).) In particular, in reviewing the documents, Marchinkowski noted that: (1) the July 5, 2005 Alexander estimate was on Plaintiff's letterhead; (2) the building permit application dated September 26, 2005 listed Desormier as the contractor and was submitted by Plaintiff; and (3) that the scope of work for the Alexander project dated September 29, 2005 was on letterhead of Desormier Contractors/Robert D. Berry. (Marchinkowski's 56.1 ¶ 46; Marchinkowski Decl. ¶ 14.) Additionally, Marchinkowski noted the similarities between the letterhead used for the July 5 estimate and the September 29 scope of work for the Alexander project, noting that the office/fax and cell phone numbers were the same, that Berry had previously identified the fax number as belonging to ICS, and that Berry was the only name listed on Desormier's letterhead, despite Rose stating that she was the sole proprietor of Desormier. (*See* Marchinkowski's 56.1 ¶¶ 48–49; Marchinkowski Decl. ¶¶ 15–17.) Marchinkowski also checked to see if NYSIF had issued other Certificates of Insurance for Desormier, and learned that another certificate had been issued to Froman. (Marchinkowski's

56.1 ¶ 50; Marchinkowski Decl. ¶ 18; Marchinkowski Decl. Ex. G (Certificate of Workers'
Compensation Insurance).)

In October 2006, Marchinkowski interviewed Froman and Silvernail, who told
Marchinkowski that at first Plaintiff stated that he had insurance through his company, ICS, but
later informed Silvernail that the policy had been changed to Marcie Rose/Desormier
Contracting because he had been unable to obtain insurance coverage in his own name due to the
"bad debit"; Silvernail also signed statements to that effect, which statements are reproduced
above.  (*See* Marchinkowski's 56.1 ¶¶ 51–52; Marchinkowski Decl. ¶¶ 19–22.)  Additionally,
approximately ten days later, Froman and Silvernail called Marchinkowski because they wanted
to make minor changes to their prior statements, which resulted in the typed statements, also
reproduced above.  (*See* Marchinkowski's 56.1 ¶ 52; Marchinkowski Decl. ¶ 22.)

Marchinkowski attempted to get a statement from Alexander, but she was uncooperative.
(Marchinkowski's 56.1 ¶ 53; Marchinkowski Decl. ¶ 23.)  However, Alexander did tell
Marchinkowski that Berry had problems obtaining insurance coverage and that he ultimately
used someone else to get the necessary policy.  (Marchinkowski's 56.1 ¶ 53; Marchinkowski
Decl. ¶ 23.)  Marchinkowski then referred the case to the Dutchess County Sheriff's Office.
(Marchinkowski's 56.1 ¶ 57; Marchinkowski Decl. ¶ 29.)  Marchinkowski summarized his
findings up until that point, collected a list of potential witnesses, and prepared a binder
containing the evidence.  (Marchinkowski's 56.1 ¶¶ 57, 59; Marchinkowski Decl. ¶¶ 29, 31;
Marchinkowski Decl. Exs. M (summary), N (potential witness list), P (table of contents of binder
of evidence).)

<u>6.  Marchinkowski's and Locke's Investigation</u>

Marchinkowski presented the information he collected to Locke, and they decided to

interview Rose.  (Marchinkowski's 56.1 ¶ 60; Marchinkowski Decl. ¶ 32.)  On December 7,

2006, Locke and Marchinkowski went to Rose's place of business.  (Marchinkowski's 56.1 ¶ 61;

Marchinkowski Decl. ¶ 33.)  After asking her some questions, they asked her to come to the

Sheriff's Office for an interview; she agreed and followed in her own car.  (Marchinkowski's

56.1 ¶ 61; Marchinkowski Decl. ¶ 33.)  Upon arrival, Locke informed Rose of her *Miranda*

rights, and she signed a *Miranda* waiver.  (Marchinkowski's 56.1 ¶ 62; Marchinkowski Decl.

¶ 34; Marchinkowski Decl. Ex. R (Rose's *Miranda* Waiver).  Rose was interviewed with a

Dutchess County Sheriff's Office ("DCSO") secretary in the room, who provided a typed

statement based on the interview.  (Marchinkowski's 56.1 ¶ 66; Marchinkowski Decl. ¶ 38.)

Rose was shown the statement and asked to review it for accuracy; Rose signed both pages, and

did not indicate that any part of the statement was inaccurate or ask to make any changes.

(Marchinkowski's 56.1 ¶ 66; Marchinkowski Decl. ¶ 38.)  Rose's signed statement provided:

> My boyfriend Robert Berry is a residential contractor. He previously had a
> company named I.C.S. Independent Construction Services, Inc., which is no longer
> in business.  On 04/15/03 he then took out a Workers Compensation policy with
> the NYS Insurance Fund, brokered through the George T. Whalen Insurance
> Agency.  There came a point in time when his insurance was cancelled for bad debt,
> premium owed to the NYS Insurance Fund in the approximate amount of $24,000.
> Robert Berry then attempted to have his mother, Janet Berry, take out a policy with
> the NYS Insurance Fund for him because he was unable to due to premium owed
> to the NYS Insurance Fund.  He could not acquire insurance while there was a
> balance due. The George. T. Whalen Insurance Company did not accept that policy
> because the names were the same.  Robert then discussed with me taking out the
> policy in my name to avoid being turned down for the policy from the NYS
> Insurance Fund.  I agreed.
>
> On September 14, 2005, my boyfriend Robert Berry and I went to the George T.
> Whalen Insurance Agency on Franklin Avenue in Millbrook NY to file the
> paperwork that was necessary to take out a Workers Compensation policy for the
> company he decided to call "Desormier Contracting, Marcia Rose DBA".  He

> decided to use the name "Desormier" because that was my maiden name. The purpose of the insurance was for work to be covered while Robert engaged in residential carpentry work. The policy was granted and Robert Berry used that insurance coverage to obtain and continue to do work in residential carpentry.
>
> I know for a fact that that insurance coverage was used by Robert Berry to file with the City of Beacon for him to be able to conduct a restoration of the Alexander residence at [redacted].
>
> I never had any active participation in the company whatsoever such as estimates, billing, actual physical labor, or scheduling appointments. I knew the only reason my name was needed to take out the policy was that Robert Berry was unable to use his name due to the previous monies owed.
>
> The actual business address for the Desormier Contacting business was located on 1103 Chestnut Ridge Road, Dover, NY (Town of Washington).

(Marchinkowski Decl. Ex. S (Rose Signed Statement).)  Much of Plaintiff's Opposition to the Motions focuses on the conduct that occurred during the interview of Rose. Plaintiff, pointing to evidence in Rose's deposition and in her affidavit, claims that the statement she made was coerced and untrue. (Pl.'s Mem. in Opp'n to Locke 8.)

On October 16, 2012, Rose swore an affidavit providing information regarding the statement she gave the police in 2006. Rose averred, in relevant part:

> On December 7, 2006, I signed a statement written by Detective Charles Locke, who advised me of my rights, which contained information not true to the questions asked of me. At the time of the questioning, I felt comfortable answering any and all questions that might be presented to me, so I did not see the need for a lawyer. After the initial general information was taken and basic questions of my name and address, where I worked and who my boyfriend was, both Mr. Marchinkowski and Mr. Locke began to ask questions regarding my business "Desormier Contractors". At this time a binder was laid before me and was opened to my Insurance Application. When asked if the signature was mine, I told the[m] "yes". I was then asked other questions regarding the genuineness of my business. I tried to tell both of them that the business was mine and that Robert Berry worked for me. [Ne]ither of them just wouldn't have it.
>
> They told me that because I had a full time job at The Fountains at Millbrook, that there was no way I could own a Construction Company or run one. I repeated I only owned it and that Robert Berry managed it.

After many inquiries pertaining to the legitimacy of Desormier Contractors, which I attested to all of, they just wouldn't accept the truth.  They also kept stating throughout the questioning "Did you know he went bankrupt?"  I told them yes, but what does that have to do with me?

After about 45 minutes of questions, I noticed the time was about 2:00 PM and I asked "what's going to happen to me?"  I was told I was going to be brought back in and fingerprinted and booked.  I told them my son was going to be home soon and I needed to be there.  It was at that point it was told to me that maybe I should think about my son.  Interpreting that as a threat, I signed what they wanted so I could leave.

Despite my original statement, I tried to contact the Bar Association on retracting my statement but had no luck.  I then waited until Robert Berry's trial to make my statement, but he was denied a trial.[7]

(Pl.'s Mem. in Opp'n to Marchinkowski Ex. S2 (Aff. of Marcia Rose ("Rose Aff.").).

Rose provided a further description of the questioning during her deposition.  In particular, Rose stated the following in her deposition, regarding the signed statement reproduced above:

Q.  Did you in fact read every page of that statement?

A.  No, I did not.

Q.  You didn't?

A.  No.

Q.  Why not?

A.  Because this—I signed this paper, but I did not say these things.

Q.  I'm simply asking if you read the statement before you signed it.

A.  I didn't.

\* \* \*

Q.  If you turn back to the first page, at the top of the statement it says Detective Lock[e] advised you of your various rights, correct?

---

[7] As discussed below, the undisputed evidence is not that Plaintiff was denied a trial on the criminal charges brought against him.

A.  Yes.

Q.  Did he in fact advise you of your various rights?

A.  Yes.

Q.  Including your right to remain silent?

A.  Yes.

Q.  And your right to an attorney?

A.  Yes.

Q.  This statement was made in December 2006, right?

A.  Yes.

Q.  You now claim it was coerced, right?

A.  Yes.

Q.  . . . Can you explain why you thought you were being coerced?

A.  Because when Detective Lock[e] and Marchinkowski came to my place of employment, they had interviewed me and had a notebook with different things, my application, and the Lisa Alexander job, and asked me if those were my signatures, and I said, "Yes."  And he asked me, you know, other questions, what did I—

Q.  Who is "he"?

A.  Both the detective and Marchinkowski, just different random questions.

                    * * *

A.  The detective—Marchinkowski and Lock[e], they wanted me to go to the Dutchess County Sheriff's Office to give a statement, and I agreed.

                    * * *

Q.  Did you read this statement before you signed it?

A.  Out of nervousness, I did not.

Q.  Okay.  And why were you nervous?

A.  Because the questions from when I was at my place of employment to the Dutchess County Sheriff's office, it changed.

21

Q.  How did it change?

A.  The detective and the investigator, you know, asked if I owned a business, and I said yes.  And they said, "How could you?  You already have a full-time job."  And he asked me the name of my business, and what I named it, and I said "Desormier."  The questions were different from when I was at the Fountains.

Q.  And because they were asking you about Desormier, you felt nervous?

A.  Not in the beginning.

Q.  So why did you become nervous?

A.  Because he was—because Detective Lock[e] and Marchinkowski were saying, "How could you own a business?  You have a full-time job.  Don't you work weekends?"

Q.  And because they said, "Don't you work weekends," you were so nervous that you signed a statement you hadn't read?

A.  I felt very intimidated, yes.

Q.  What did they say that made you feel so intimidated?

A.  They asked me questions, and I answered them.  But it just seemed like the answers I was giving them, they weren't having it.  They were just saying, "No, no."

Q.   And you found "No, no" to be intimidating?

A.  Yes.

Q.  Did they say anything else that you found intimidating?

A.  Yes.  He was asking me things from here, and I said, "What is going to happen to me?"  Like I—I didn't think that I did anything wrong, but they made me feel like I did.   I told them what I did to open a business.

Q.  Okay.

A.  And I said that I went and got insurance, I got a DBA, I opened a checking account, and they—Marchinkowski and Lock[e], were like, "No."

Q.  "No" is why you felt threatened?

A.  Yes.

22

Q.  Anything else they said that made you feel intimidated and nervous?

A.  Yes.  I had said, you know, "What's going to happen to me?  And he said, "You have a son to think about."  He said, "You're going to be fingerprinted and booked."  And I just wanted to get the heck out of there, and I signed the statement.  I never looked at it, never.

Q.  Except for when you signed both pages?

A.  I just signed, I just signed my name.  I never read this over.

(Rose Tr. 197–202.)

Later, Rose stated that she did not know why she never asked for a lawyer, (*id.* at 205–06), that she never called the Dutchess County Sheriff's Office to correct the statement, (*id.* at 204–05), but that she called the bar association in Poughkeepsie, (*id.* at 204).  Additionally, during the deposition, counsel for Marchinkowski went through the statement with Rose, paragraph by paragraph.  (*Id.* 206–11.)  Rose stated that the sentence "I know for a fact that insurance coverage was used by Robert Berry to file with the City of Beacon for him to be able to conduct a restoration of the Alexander residence" was false because it was used by her, though she acknowledged that Berry did work on the Alexander project, and that the statement that the actual business address was 1103 Chestnut Ridge Road was false, as it was 55 Front Street, but acknowledged that everything else in the statement was accurate.  (*Id.*)

Prior to their interview with Rose, Marchinkowski and Locke were unaware that Janet Berry had submitted an application to NYSIF in an attempt to get workers' compensation insurance.  (Marchinkowski's 56.1 ¶ 67; Marchinkowski Decl. ¶ 40.)  Following the interview with Rose, they confirmed this piece of information by calling the insurance agency that submitted Janet Berry's NYSIF application, at which point they learned that the same insurance agent, Brussel-Smith, submitted the applications, supposedly on behalf of Janet Berry and

Desormier.  (Marchinkowski's 56.1 ¶ 67; Marchinkowski Decl. ¶¶ 40–41.)  At that point, Locke

called the District Attorney's ("DA") Office, and Locke stated that the DA's office had

authorized the prosecution of Plaintiff.  (Marchinkowski's 56.1 ¶ 69; Marchinkowski Decl.

¶¶ 42–43.)  On December 12, 2006, Brussel-Smith came to the DCSO for an interview, and

provided the statement discussed above.  (*See* Marchinkowski's 56.1 ¶ 70; Marchinkowski Decl.

¶ 44.)

### 7.  Plaintiff's Arrest and Prosecution

Plaintiff was charged with (1) grand larceny in the third degree, in violation of N.Y.

Penal Law § 155.35, (2) offering a false instrument for filing, in violation of N.Y. Penal Law

§ 175.35, and (3) committing a fraudulent practice, in violation of N.Y. Workers Compensation

Law § 114(3).  (Marchinkowski's 56.1 ¶ 72; Marchinkowski Decl. Ex. V (Felony Complaint).)

The felony complaint was signed by Locke on December 3, 2006, and stated:

> The facts upon which this Felony Complaint is based are as follows:
>
> The said defendant, Robert D. Berry, on September 14, 2005, at the aforesaid location, with intent to defraud and benefit himself did wrongfully withhold twenty-four thousand four hundred twenty-nine dollars and forty-six cents ($24,429.46) as insurance premiums from the New York State Insurance Fund.  TO WIT: the said defendant Robert D. Berry did knowingly cause a fraudulent application for workers compensation insurance to be filed through the New York State Insurance Fund by using the George T. Whalen Insurance Agency as a broker to obtain this insurance. Deponent further states that the said defendant by means of concealing information did obtain a benefit and by soliciting another to file the fraudulent application to obtain insurance when in fact the defendant knew he was the true owner of the business and was unable to obtain insurance through the New York state Insurance Fund due to $24,429.46 in past unpaid premium.
>
> The foregoing factual allegations are based upon personal knowledge of the complainant and upon information and belief, the sources of complainant's information and belief being, depositions of Richard Morrison, Ann Froman, Rodney Silvernail, Russell DeForest, voluntary statement of Marcia Rose, applications of insurance by Robert Berry and Marcia Rose, audits conducted by the New York State Insurance Fund, written estimates of "Desormier Contracting" written by Robert Berry, banking records of "Desormier Contracting,["] and

investigation by Stan Marchinkowski of the New York State Insurance Fund and
the Dutchess County Sheriff's Office.

(Marchinkowski Decl. Ex. V (Felony Complaint).)

On December 13, 2006, Berry turned himself in to Locke.  (Marchinkowski's 56.1 ¶ 72;

Marchinkowski Decl. ¶ 45.)  Marchinkowski had no involvement in the case after the arrest and

arraignment; he did not communicate with the District Attorney's Office ("DA's Office"), attend

or provide testimony at any criminal proceedings, or participate in the prosecution in any other

way.  (Marchinkowski's 56.1 ¶ 75; *see also* Marchinkowski Decl. ¶ 45; Berry Tr. 260, 273–74.)

Similarly, Locke had no interaction with Plaintiff after the arrest, nor did he testify at grand jury

proceedings or any preliminary hearings or trial, or consult with the DA's Office regarding

Plaintiff's criminal case.  (Locke's 56.1 ¶¶ 66–68; Aff. of Charles Locke ¶ 15 (Dkt. No. 130);

Berry Tr. 273–74.)  Neither Defendant played a role in plea negotiations.  (Locke's 56.1 ¶ 77;

Aff. of Edward Whitesell ("Whitesell Aff.") ¶ 21 (Dkt. No. 131).)

Plaintiff was represented by four attorneys during his criminal case: Ronald Tomlins,

Brittany Kilpatrick, William Tendy, and Rudolph Russo, of the Public Defender's Office.  (*See*

Marchinkowski's 56.1 ¶ 76; Berry Tr. 253–59; Whitesell Aff. ¶¶ 5–11.)  In April 2007, a grand

jury waiver was filed by Mr. Russo, meaning that counsel for Plaintiff was insisting that Plaintiff

wanted to waive his right to a preliminary hearing and have his case referred to the grand jury

under N.Y. Criminal Procedure Law ("N.Y. C.P.L.") § 180.30.  (*See* Marchinkowski's 56.1 ¶ 77;

Whitesell Aff. ¶ 11; Whitesell Aff. Ex. E, at unnumbered 2 (Letter from Ronald R. Tomlins to

Judge Priscoe (Apr. 24, 2007)).)  Normally, when a court receives a so-called § 180.30 waiver, it

is divested of jurisdiction and the DA's Office must present to the Grand Jury within a year or

the case is subject to dismissal.  *See* N.Y. Crim. Proc. Law § 180.30.  (*See also* Whitesell Aff.

¶ 14.)  The DA's Office did not know about the waiver, and the DA's Office engaged in plea

negotiations through the summer of 2008 with Plaintiff's other lawyers.  (Marchinkowski's 56.1 ¶¶ 76–77; Locke's 56.1 ¶ 71; Berry Tr. 253–58 (stating that he had been presented with a plea deal by his lawyer in the summer of 2008); Whitesell Aff. ¶¶ 6–13 (discussing the plea negotiations).)[8]  Up until July 2008, the DA's Office and defense attorneys Mr. Tendy and Ms. Kilpatrick agreed to a series of adjournments in order to allow the parties to continue plea negotiations.  (Locke's 56.1 ¶ 72–73; Whitesell Aff. ¶ 14.)  However, in July 2008, Plaintiff's then-attorney, Mr. Russo, advised the state court and the DA's Office that the waiver had been filed in April 2007, and in January 2009, the criminal case was dismissed under to N.Y. C.P.L. § 180.85(3), as it was not presented to the Grand Jury within twelve months of arraignment.  (Marchinkowski's 56.1 ¶¶ 77–78; Locke's 56.1 ¶¶ 72, 78; Posner Aff. Ex. W (Decision and Order Terminating Prosecution).).  *See also* N.Y. Crim. Proc. Law § 180.85(2)–(3).[9]

The DA's Office did not make a conscious decision to decline to present in a timely fashion, nor did the DA's Office come to believe there was not probable cause to prosecute. (Locke's 56.1 ¶¶ 75–76; Whitesell Aff. ¶¶ 16, 19.)[10]

---

[8] Plaintiff disputes this, asserting that the DA's notes on this case indicate that Whitesell knew about the waiver.  (*See* Pl.'s Mem. in Opp'n to Marchinkowski 2.)  However, the document cited by Plaintiff supports Whitesell's version of events, not Plaintiff's.  The document states that on June 24, 2008, Plaintiff's then-lawyer Kilpatrick notified the DA's Office that Plaintiff *intended to* waiver to the grand jury, and that on July 22, 2008, Plaintiff's new lawyer, Russo, notified the DA's Office that the waiver had indeed already been filed in April.  (Pl.'s Mem. in Opp'n to Locke Ex. A1, at unnumbered 2.)

[9] Plaintiff asserts that the case was terminated due to the fact that there was no evidence against him, as well as under § 180.85(3).  (Pl.'s Mem. in Opp'n to Marchinkowski 2.)  In support, Plaintiff cites the brief in support of the motion his attorney filed for the case to be dismissed.  (Pl.'s Mem. in Opp'n to Locke Ex. B1 (Motion To Dismiss).)  However, the dismissal by the Court contains no indication that there was any basis for the dismissal other than § 180.85(3).  (*See* Posner Aff. Ex. W (Decision and Order Terminating Prosecution).)

[10] Plaintiff's assertion to the contrary is unsupported, as he cites only a letter from his attorney to him, indicating that *his attorney* was still investigating whether his conduct rose to a

<u>8.  Plaintiff's Bankruptcy Proceeding</u>

Plaintiff filed for bankruptcy in June 2006, and his debt was discharged in a Chapter 7 bankruptcy proceeding on September 12, 2006.  (*See* Pl.'s Mem. in Opp'n to Marchinkowski Ex. D (Discharge of Debtor).)  Included on the list of creditors were the Dutchess County Sheriff-Civil, 150 North Hamilton St. PO Box 389, Poughkeepsie, NY 12601 and New York State Ins. Fund, PO Box 4788, Syracuse, NY 13221-4788.  (*Id.* at 34–35.)  In his Opposition, Plaintiff asserts that his prosecution was an "attempt to circumvent Bankruptcy proceedings."  (Pl.'s Mem. in Opp'n to Marchinkowski 14.)  He asserts that Defendants knew about the bankruptcy.  (*Id.*)  As evidence of this, he points to the fact that Dutchess County Sheriff's office and the NYSIF were served in relation to his bankruptcy proceeding.  (*See id.* (citations omitted).)  Additionally, Plaintiff submitted an Affidavit signed by Rose, dated October 16, 2012.  That Affidavit states: "[Marchinkowski and Locke] also kept stating throughout the questioning 'Did you know he went bankrupt?'"  (Pl.'s Mem. in Opp'n to Marchinkowski Ex. S2 (Rose Aff.).)  However, contrary to Plaintiff's contention, (*See* Pl.'s Mem. in Opp'n to Marchinkowski 12–13), this was undercut by Rose's deposition testimony.  That evidence indicates that Defendants were not asking Rose about the bankruptcy proceeding, but rather were asking her about the $24,000 Plaintiff owed NYSIF.

> Q.  You say they kept throughout questioning asking, "Did you know he went bankrupt?", right?
>
> A.  Yes, they said that a lot too.
>
> Q.  Both of them?
>
> A.  Yes.

---

criminal level.  (Pl.'s Mem. in Opp'n to Marchinkowski 2; Pl.'s Mem. in Opp'n to Locke Ex. B (Letter from William M. Tendy, Jr. to Robert Berry).)

Q.  What did they say?

A.  They said, "Do you know about the twenty-four thousand?"  And I saw in a notebook, and it was circled, and I said, "Yes, I did know about it, but it didn't have anything to do with me," but I did know.

Q.  So they asked you if you knew that he owed NYSIF twenty-four thousand dollars?

A.  Yes.

Q.  What does that have to do with the bankruptcy?

A.  It doesn't have anything to do with the bankruptcy.

Q.  So what did they ask you about a bankruptcy?

A.  They just asked me if I knew about the twenty-four thousand.

(Rose Tr. 213–14.)  Additionally, Plaintiff asserts in his Memorandum that "Detective Locke was told personally by Robert Berry that he had filed bankruptcy, and his response was 'I didn't care and just wanted to get this over and get on with his day.'"  (Pl.'s Mem. in Opp'n to Locke at 9–10; *see also id.* at 16 ("Robert Berry called immediately (being approximately 4:30 pm) and spoke to the detective.  Detective Lock[e] demanded that he come to the station and turn himself in.  Robert Berry asked him why and the detective stated for Grand Larceny of $24,000.00 to the New York State Insurance Fund.  Robert responded with 'I went bankrupt.'  Detective Locke was not interested in any explanations regarding Mr. Berry's innocence.").)

In reply, Marchinkowski disputes his knowledge of the bankruptcy at the time of the investigation, noting that the investigation commenced in April 2006, before Plaintiff filed for bankruptcy, that Marchinkowski testified that he did not know about the bankruptcy, and that the notice of Bankruptcy was sent to Syracuse, but Marchinkowski's office is in Albany.  (Reply Mem. of Law in Further Supp. of Def. Stanley Marchinkowski's Mot. for Summ. J.

28

("Marchinkowski's Reply") 18–19 (Dkt. No. 153); *see also* Marchinkowski Decl. ¶¶ 2, 4; Aff. of

Robert Berry ("Berry Aff. in Opp'n to Marchinkowski") Ex. 4 (Dep. Tr. of Stanley

Marchinkowski ("Marchinkowski Tr.")), at 18, 71, 73–75 (Dkt. No. 144).)  Similarly, Locke

responds that he did not have notice of the bankruptcy proceeding because the notification was

sent to the Civil Division of the Dutchess County Sheriff's Office, which has a different

computer system than the criminal division.  (Charles Locke's Reply Mem. of Law in Supp. of

Summ. J. ("Locke's Reply") 5 (Dkt. No. 151); Aff. of Robert Berry ("Berry Aff. in Opp'n to

Locke") Ex. 3 (Dep. Tr. of Charles Locke ("Locke Tr.")), at 40–41 (Dkt. No. 146).)

      B.  Procedural Background

      Plaintiff filed suit in New York Supreme Court, County of Dutchess in April 2009, and

Defendants removed to federal court on April 30, 2009.  (Dkt. No. 1.)  Plaintiff filed a Verified

Complaint on June 8, 2009, which Complaint asserted claims against the Village of Millbrook,

the Dutchess County District Attorney's Office, the NYSIF, the *Daily Freeman*, and John and/or

Jane Doe.  (Dkt. No. 4.)  On November 7, 2009, Plaintiff voluntarily dismissed NYSIF from the

case.  (Dkt. No. 27.)  On January 27, 2010, Plaintiff filed a Motion for Leave to File an Amended

Complaint, which added Marchinkowski and Locke as Defendants.  (Dkt. Nos. 30, 34.)  By

Opinion dated September 29, 2010, the Court granted Plaintiff permission to file his Amended

Complaint with the proposed § 1983 claims against Locke and Marchinkowski, but without his

proposed defamation claims, (Dkt. No. 40), and Plaintiff filed his Amended Complaint, (Dkt.

No. 41).  On December 14, 2010, Plaintiff voluntarily dismissed his claims against the *Daily

Freeman*.  (Dkt. No. 59.)  On December 17, 2010, Plaintiff filed a Second Amended Verified

Complaint, (Dkt. No. 57), and on September 26, 2011, the Court dismissed that Complaint on

Motions of the Village of Millbrook and the Dutchess County District Attorney's Office, (Dkt.

No. 63). Finally, Plaintiff filed a Third Amended Complaint on November 4, 2011, (Dkt. No. 65), and the Court dismissed Plaintiff's claims against the Village of Millbrook with prejudice, substituted Dutchess County for the Dutchess County District Attorney's Office, and dismissed the claims against Dutchess County without prejudice, (Dkt. No. 87), leaving only the claims against Marchinkowski and Locke remaining.[11]

After the close of discovery and with the permission of the Court, on July 25, 2014, Locke filed a Motion for Summary Judgment and accompanying papers, (Dkt. Nos. 126–34), as did Marchinkowski, (Dkt. Nos. 135–42). Plaintiff filed his Opposition to both Motions on August 27, 2014. (Dkt. Nos. 143–47, 150.) Locke filed his Reply on September 18, 2014, (Dkt. No. 151), and Marchinkowski did the same on September 19, 2014, (Dkt. Nos. 153–54). On July 13, 2015, the Court ordered the Parties to submit supplemental briefing on the issue of whether Defendants had arguable probable cause for each of the three charges brought against Plaintiff, (Dkt. No. 156), which the Parties submitted on July 20, 2015, (Dkt. Nos. 157, 159, 162, 163).

---

[11] In his Third Amended Complaint, Plaintiff identifies as defendants "JOHN AND/OR JANE DOE," (*see* Third Am. Verified Compl. at unnumbered 1), who, Plaintiff asserts, "are fictitious individuals or corporate entities whose true identities may be revealed as the case unfolds," (*id.* ¶ 6). At no point in his Third Amended Complaint, however, does Plaintiff allege what, if anything, John or Jane Doe did. Accordingly, any claims against John and/or Jane Doe are dismissed. *See Claude v. Wells Fargo Home Mortg.*, No. 13-CV-535, 2014 WL 4073215, at *1 n.1 (D. Conn. Aug. 14, 2014) (dismissing complaint against unnamed John Doe 1 and Jane Doe 1 defendants for failure to plead a claim upon which relief may be granted where the plaintiff "ma[d]e[] no allegations against [either] and [did] not attempt to explain the basis for naming them as [d]efendants"); *Almonte v. McGoldrick*, No. 06-CV-15217, 2009 WL 528609, at *4 (S.D.N.Y. Mar. 2, 2009) (noting that "[n]o allegations are made with respect to John Does # 9–# 11" and dismissing claims against them accordingly).

II.  Discussion

A.  Materials Considered in Deciding this Motion

When ruling on a motion for summary judgment, a district court should only consider evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)) (citing Fed. R. Evid. 602)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge."); *Baity v. Kralik*, 51 F.Supp.3d 414, 419–20, 421 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks omitted)); *Zigmund v. Foster*, 106 F. Supp. 2d 353, 356 (D. Conn. 2000) (noting that "[a]n affidavit in which the plaintiff merely restates the conclusory allegations of the complaint" is insufficient to support a motion for summary judgment).  Furthermore, "a pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Perez v. de la Cruz*, No. 09-CV-264, 2013 WL 2641432, at *7 (S.D.N.Y. June 12, 2013) (alteration, italics, and internal quotation marks omitted); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("The non-moving party may not rely on conclusory allegations or unsubstantiated speculation."); *Alzawahra v. Albany Med. Ctr.*, No. 11-CV-227, 2012 WL 5386565, at *1 (N.D.N.Y. Nov. 1, 2012) ("In this

31

regard, a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials asserted in the pleadings, or on conclusory allegations or unsubstantiated speculation." (citation and internal quotation marks omitted)), *aff'd*, 546 F. App'x 53 (2d Cir. 2013). Therefore, the Court disregards factual allegations asserted in Plaintiff's Memorandum of Law that are not supported by admissible evidence. *See Mitchell v. Igoe*, No. 06-CV-186, 2009 WL 3165659, at *8 (N.D.N.Y. Sept. 25, 2009) ("Statements contained within a memorandum . . . without proper evidentiary support, do not constitute competent evidence upon which a court may base its ruling upon a motion for summary judgment." (citing *Commerce & Indus. Ins. Co. v. Vulcraft, Inc.*, No. 97-CV-2578, 1998 WL 823055, *11 (S.D.N.Y. Nov. 20, 1998)), *aff'd*, 407 F. App'x 536 (2d Cir. 2011); *Caracciola v. City of New York*, No. 95-CV-3896, 1999 WL 144481, at *4 (S.D.N.Y. Mar. 17, 1999) ("In opposition to this summary judgment motion, plaintiffs have proffered a three-page memorandum of law and their attorney's affirmation, neither of which constitutes admissible evidence as contemplated by Fed. R. Civ. P. 56(e).").  For example, Plaintiff asserts, without citation:

> As per defenses allegations that Ms. Rose never had any active participation in the company whatsoever is an intentional misrepresentation of fact.  All testimony has depicted Ms. Rose as the legitimate owner of Desormier Contractors and in no way was fraudulent or a scheme for Robert Berry to avoid his financial responsibilities to the New York State Insurance Fund.

(Pl.'s Mem. in Opp'n to Locke 9.)  Additionally, Plaintiff asserts, also without citation:

> Desormier Contracting was never a Front Company or was set up to defraud the New York State Insurance Fund.  Desormier Contractors was set up by Ms. Rose on her own accord, followed the rules for registering it with the Count, properly applied for insurance, filed her Income Tax for the year, and completed Ms. Alexander's project.  No crimes were ever committed by Ms. Rose, Robert D. Berry or Ms. Janet Berry.

(*Id.* at 13.)[12]

B.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.,* No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cty.*

---

[12] The Court will note other such unsupported factual assertions, as are relevant, below.

*of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene.*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod,* 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks removed) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and internal quotation marks omitted).

34

C.  Analysis

    1.  The Motion is Ripe for Review

First, in his Opposition, Plaintiff implies that there is evidence not yet before the Court

that should be considered before deciding the instant Motion.  In particular, he states: "Three (3)

witnesses that gave statements were not deposed due to Mr. Berry's indigent circumstances,

when multiple documents conflicted greatly with their statements showing that their conclusions

were influenced by the Defendants themselves."  (Pl.'s Mem. in Opp'n to Marchinkowski 21.)

Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons,

it cannot present facts essential to justify its opposition, the court may: (1) defer considering the

motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3)

issue any other appropriate order."  Fed. R. Civ. P. 56(d).  Any such affidavit or declaration

"must describe: (1) what facts are sought and how they are to be obtained, (2) how such facts are

reasonably expected to raise a genuine issue of material fact, (3) what efforts the affiant has

made to obtain them, and (4) why the affiant's efforts were unsuccessful."  *Walden v. Sanitation

Salvage Corp.*, No. 14-CV-112, 2015 WL 1433353, at *2 (S.D.N.Y. Mar. 30, 2015); *see also

Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994) (same).  Here, Plaintiff did

not submit an affidavit or declaration, despite having been served with two Notices to Pro Se

Litigant Who Opposes a Motion For Summary Judgment, which attached Rule 56(d) and set

forth the requirement for an affidavit supporting a Rule 56(d) discovery request.  (*See* Dkt. Nos.

128, 136.)  Nor did Plaintiff provide the information necessary under Rule 56(d), even in a

conclusory fashion.  Thus, to the extent Plaintiff seeks relief under Rule 56(d), it is denied.  *See

Gumbs v. Dynan*, No. 11-CV-857, 2012 WL 3705009, at *17 (E.D.N.Y. Aug. 26, 2012) (denying

pro se plaintiff's request for relief under 56(d) because he failed to submit an affidavit, which

would be sufficient grounds for denial on its own, and he also did not provide information on the "four categories of information requisite to [the] [c]ourt's permission to conduct Rule 56(d) discovery"); *see also Lunts v. Rochester City Sch. Dist.*, 515 F. App'x 11, 13–14 (2d Cir. 2013) (affirming grant of summary judgment against pro se plaintiffs because their sworn affidavit was insufficient under 56(d) and they did not identify any "potentially discoverable evidence that would have raised a genuine issue of material fact as to any of their claims"), *cert. denied*, 134 S. Ct. 429 (2013); *Roswell Capital Partners LLC v. Alternative Constr. Techs.*, 638 F. Supp. 2d 360, 371 (S.D.N.Y. 2009) ("The failure to file an affidavit under Rule 56(f) [now renumbered 56(d)] is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." (internal quotation marks omitted) (quoting *Di Benedetto v. Pan Am World Serv., Inc.,* 359 F.3d 627, 630 (2d Cir. 2004))).

### 2.  False Arrest

#### a.  Applicable Law

A "§ 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006); *see also Widget v. Town of Poughkeepsie*, No. 12-CV-3459, 2013 WL 1104273, at *4 (S.D.N.Y. Mar. 18, 2013) (same). "In analyzing § 1983 claims for unconstitutional false arrest, [courts] have generally looked to the law of the state in which the arrest occurred." *Jaegly*, 439 F.3d at 151 (internal quotation marks omitted); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) ("A § 1983 claim for false arrest . . . is substantially the same as a claim for false arrest under New York law." (internal quotation marks omitted)).  Under New York Law, which is applicable here, "an action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine

him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged.'" *Ackerson*, 702 F.3d at 19 (quoting *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)).

"Probable cause 'is a complete defense to an action for false arrest' brought under New York law or § 1983." *Id.* (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)); *see also Conte v. Cty. of Nassau*, No. 06-CV-4746, 2010 WL 3924677, at *12 (E.D.N.Y. Sept. 30, 2010) (same). "Probable cause to arrest exists when the officers have . . . reasonably trustworthy information as to[] facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been . . . committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). To determine whether probable cause existed for an arrest, a court "assess[es] whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Ackerson*, 702 F.3d at 19 (internal quotation marks omitted). Where, as here, "there is more than one officer cooperating in the investigation, the knowledge of each officer is presumed to be shared by all." *Abdul-Rahman v. City of New York*, No. 10-CV-2778, 2012 WL 1077762, at *5 (E.D.N.Y. Mar. 30, 2012); *see also Conte v. Cty. of Nassau*, No. 06-CV-4746, 2008 WL 905879, at *9 (E.D.N.Y. Mar. 31, 2008) ("Under the collective knowledge doctrine, if one law enforcement officer had probable cause to arrest, cooperating law enforcement officers are deemed to have probable cause as well."). Moreover, "probable cause does not require an awareness of a particular crime, but only that some crime may have been committed." *Ackerson*, 702 F.3d at 20 (internal quotation marks omitted). Accordingly, "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly*, 439 F.3d at 154. "Stated differently, when faced with a claim for

false arrest, [the focus is] on the validity of the *arrest,* and not on the validity of each charge."

*Id.* "The burden of establishing the absence of probable cause rests on the plaintiff," and "[t]he

question of whether or not probable cause existed may be determinable as a matter of law if there

is no dispute as to the pertinent events and the knowledge of the officers." *Sethi v. Nassau Cty.*,

No. 11-CV-6380, 2014 WL 2526620, at *4 (E.D.N.Y. June 3, 2014) (internal quotation marks

omitted); *see also Nickey v. City of New York*, No. 11-CV-3207, 2013 WL 5447510, at *5

(E.D.N.Y. Sept. 27, 2013) ("[W]hen the facts material to a probable cause determination are

undisputed, the matter is a question of law properly decided by the [c]ourt.").

Finally, "although a police officer is generally not required to investigate an arrestee's

claim of innocence, 'under some circumstances, a police officer's awareness of the facts

supporting a defense can eliminate probable cause.'" *Conte*, 2010 WL 3924677, at *14 (quoting

*Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003)).  Nevertheless, "[o]nce a police officer has

a reasonable basis for believing there is probable cause, he is not required to . . . eliminate every

theoretically plausible claim of innocence before making an arrest."  *Widget*, 2013 WL 1104273,

at *6 (internal quotation marks omitted).  "The crucial question then, is whether the arresting

officers deliberately disregarded facts known to them which established" a defense.  *Id.*

### b.  Qualified Immunity

Plaintiff argues that Marchinkowski is not entitled to qualified immunity because NYSIF

is a private company.  (Pl.'s Mem. in Opp'n to Marchinkowski 27–28.)  However, this argument

is factually and legally incorrect.  NYSIF is a state agency.  *See Lipofsky v. Steingut*, 86 F.3d 15,

16 (2d Cir. 1996) ("Although in certain respects SIF functions similarly to a private insurer, we

conclude that it is nonetheless a State agency entitled to Eleventh Amendment immunity."); *see

also Calvert Ins. Co. v. State Ins. Fund*, No. 03-CV-4063, 2003 WL 21362718, at *1 (S.D.N.Y.

June 12, 2003) (same).  Thus, Marchinkowski, as a state government employee, is entitled to

qualified immunity, as is Locke, a point Plaintiff does not dispute.  *See Seitz v. DeQuarto*, 777 F.

Supp. 2d 492, 500 (S.D.N.Y. 2011) ("Individual state employees may claim qualified immunity

'insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald,* 457 U.S. 800,

818 (1982))).

A police officer or other government official will be protected from liability for his

discretionary actions by the doctrine of qualified immunity "if either (1) his conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known, or (2) it was objectively reasonable for him to believe that his actions were lawful

at the time of the challenged act."  *See Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001)

(citation and internal quotation marks omitted).  Qualified immunity "gives government officials

breathing room to make reasonable but mistaken judgments," and it protects "all but the plainly

incompetent or those who knowingly violate the law."  *City & Cty. of San Francisco v. Sheehan*,

135 S. Ct. 1765, 1774 (2015) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*,

563 U.S. 731, 131 S. Ct. 2074, 2085 (2011)).  "In the case of allegations to which probable cause

is a complete defense, such as false arrest or imprisonment, the Second Circuit has defined the

standard of qualified immunity as one of 'arguable probable cause.'"  *Betts v. Shearman*, No. 12-

CV-3195, 2013 WL 311124, at *4 (S.D.N.Y. Jan. 24, 2013) (footnote omitted) (quoting *Cerrone*,

246 F.3d at 202), *aff'd*, 751 F.3d 78 (2d Cir. 2014).  "Arguable probable cause exists when a

reasonable police officer [or government official] in the same circumstances and possessing the

same knowledge as the officer [or official] in question *could* have reasonably believed that

probable cause existed in the light of well established law."  *Cerrone*, 246 F.3d at 202–03

(internal quotation marks omitted).  In other words, an officer is entitled to qualified immunity if (1) "it was objectively reasonable for the officer to believe that probable cause existed," or (2) "officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991); *see also Betts*, 2013 WL 311124, at *4 (same).

<u>c.  Analysis</u>

In this case the undisputed evidence overwhelmingly shows that there was probable cause to arrest Plaintiff based on the facts in the possession of Locke and Marchinkowski.  When Plaintiff was arrested on December 13, 2006, Locke and Marchinkowski had collected a great deal of incriminating information.  First, they had information that Plaintiff had previously taken out a NYSIF workers' compensation policy in his own name, and that the policy was canceled due to nonpayment in the amount of $24,000.  (*See* Marchinkowski's 56.1 ¶ 42; Marchinkowski Decl. ¶ 9; Marchinkowski Decl. Ex. C (Print Outs from the NYSIF System); *see also* Marchinkowski Decl. Ex. B (Division of Confidential Investigations Investigation Request).)  Second, they had information that Plaintiff's live-in girlfriend then took out a NYSIF policy for Desormier.  (*See* Marchinkowski Decl. Ex. S (Rose Signed Statement).)  They knew that the scope of work for Desormier's performance of the Alexander contract was spelled out on letterhead that contained only Plaintiff's name, and did not include Rose's name, and contained the same office/fax and cell phone numbers as were previously on the letterhead of ICS, Plaintiff's former company.  (Marchinkowski's 56.1 ¶¶ 48–49; Marchinkowski Decl. ¶¶ 15–17.)  Third, Defendants had sworn statements from Froman and Silvernail prior to the arrest.  (*See* Marchinkowski Decl. Ex. I.)  Silvernail provided information that Plaintiff was using Desormier's insurance policy to conduct his own personal work, as he could not get insurance in

his own name due to "bad [debt]."  (*See id.* (Typed Sworn Statement of Rodney Silvernail).)

Silvernail stated that Plaintiff told him he could not get the policy in his own name, so he would

get it in his mother's name, and then provided a policy in the name of Desormier Contracting.

(Pl.'s Mem. Opp'n to Marchinkowski Ex. L (Handwritten Sworn Statement of Rodney

Silvernail).)[13]  Moreover, Alexander had told Marchinkowski that Plaintiff had problems

obtaining insurance and ultimately used someone else to get the necessary policy.

(Marchinkowski's 56.1 ¶ 53; Marchinkowski Decl. ¶ 23.)

 Finally, Locke and Marchinkowski learned from their interview with Rose that after

Plaintiff's insurance policy was canceled, he first "attempted to have his mother, Janet Berry,

take out a policy with the NYS Insurance Fund for him," that Rose agreed to take out a policy in

her name, that Rose "never had any active participation in the company whatsoever such as

estimates, billing, actual physical labor, or scheduling appointments," and that she "knew the

only reason [her] name was needed to take out the policy was that Robert Berry was unable to

use his name due to the previous monies owed."  (Marchinkowski Decl. Ex. S (Rose Signed

Statement).)  They then called the insurance agency that submitted Janet Berry's applications,

and they learned that the same agent—Brussel-Smith—completed both Janet Berry's and Rose's

applications.  (Marchinkowski's 56.1 ¶ 67; Marchinkowski Decl. ¶¶ 40–41.)

 Based on the information possessed by Defendants at the time of the arrest, there was

probable cause to arrest Plaintiff for a violation of N.Y. Workers' Compensation Law § 114(1),

which provides in relevant part:

> Any person who, knowingly and with intent to defraud presents, causes to be
> presented, or prepares with knowledge or belief that it will be presented to or by an
> insurer or purported insurer, or any agent thereof, any written statement as part of,

---

[13] Froman's statement did not provide information pertaining to Plaintiff's insurance
policy.

or in support of, an application for the issuance of or the rating of an insurance policy for compensation insurance, or a claim for payment or other benefit pursuant to a compensation policy which he or she knows to: (i) contain a false statement or representation concerning any fact material thereto; or (ii) omits any fact material thereto, shall be guilty of a class E felony.

N.Y. Workers' Comp. Law § 114(1).

Plaintiff's arguments that there was not probable cause (or arguable probable cause) to arrest fall into two categories: (1) that Rose's statement was coerced and Defendants knew the information provided to be untrue, and (2) that Defendants knew about Plaintiff's bankruptcy proceeding and intentionally disregarded this evidence he asserts established his innocence.

Turning first to Plaintiff's assertion that Rose's statement was coerced, the following is undisputed. Locke and Marchinkowski went to Rose's work and began asking her questions. (Marchinkowski's 56.1 ¶ 61; Marchinkowski Decl. ¶ 33.) They asked her to come to the Sheriff's Office, she agreed, and she followed in her own car. (Marchinkowski's 56.1 ¶ 61; Marchinkowski Decl. ¶ 33.) Upon arrival, Locke informed her of her *Miranda* rights, and she signed a *Miranda* waiver. (Marchinkowski's 56.1 ¶ 62; Marchinkowski Decl. ¶ 34; Marchinkowski Decl. Ex. R (Rose's *Miranda* Waiver).) Rose was interviewed, a secretary typed a statement for her, she was told to review it for accuracy and she signed both pages without indicating that anything was incorrect or that she wished to make any changes. (Marchinkowski's 56.1 ¶ 66; Marchinkowski Decl. ¶ 38.) Rose has stated that she did not read the statement before signing it because she felt intimated. (Rose Tr. 197–202). Rose also has claimed that she felt intimidated because "it just seemed like the answers I was giving them, they weren't having it. They were just saying, 'No, no.'" (*Id.* 197–202.) The only other thing Rose points to for why she felt intimidated and nervous was the following:

> I had said, you know, "What's going to happen to me?" And he said, "You have a son to think about." He said, "You're going to be fingerprinted and booked." And

I just wanted to get the heck out of there, and I signed the statement.  I never looked
at it, never.

(*Id.*)  The evidence shows that about forty-five minutes into the interview, Rose began to feel

nervous, but still did not ask for a lawyer.  (Rose Tr. 216.)  Additionally, the evidence shows that

Rose was at the Sheriff's Office for a total of an hour to an hour-and-a-half.  (Rose Tr. 224–25.)

Even assuming the version of facts set forth by Plaintiff, that Rose felt coerced and gave

false information, this alone does not defeat probable cause to arrest.  "[P]robable cause can exist

even where it is based on mistaken information, so long as the arresting officer acted reasonably

and in good faith in relying on that information."  *Bernard v. United States*, 25 F.3d 98, 102 (2d

Cir. 1994); *see also Bouche v. City of Mount Vernon*, No. 11-CV-5246, 2013 WL 322613, at *4

(S.D.N.Y. Jan. 28, 2013) (same).  However, "if a defendant knows that witness statements are

false or coerced, this will defeat probable cause."  *Id.* at *6.

Rose now claims that her statement to Defendants was false.  (*See* Pl.'s Mem. in Opp'n to

Marchinkowski Ex. S2 (Rose Aff.).)  However, the probable cause, or arguable probable cause,

determination depends on the information Defendants knew at the time of the arrest.  *See Panetta

v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("When determining whether probable cause exists

courts must consider those facts available to the officer *at the time of the arrest* and immediately

before it, as probable cause does not require absolute certainty." (emphasis, citations, alterations,

and internal quotation marks omitted) (emphasis added)); *Cooper v. City of New Rochelle*, 925 F.

Supp. 2d 588, 610 (S.D.N.Y. 2013) ("Whether or not an officer had probable cause to make an

arrest is a question of what the officer knew at the time of the arrest and whether she or he was

reasonable in relying on that knowledge." (internal quotation marks omitted)).  Therefore, even if

Rose later claims, after the arrest, that her statement contained false information, this "does not

change the analysis unless [Defendants] *knew* that her statements were false."  *Lederman v.*

*Benepe*, No. 12-CV-6028, 2014 WL 1318356, at *11 (S.D.N.Y. Mar. 28, 2014) (emphasis

added).  There is no evidence that either Locke or Marchinkowski knew or had any reason to

suspect the information Rose provided was false.  *See id.* ("When information is received from a

putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as

to the person's veracity." (internal quotation marks omitted)); *see also Bouche*, 2013 WL

322613, at *6 ("[I]f a defendant knows that witness statements are false or coerced, this will

defeat probable cause.  However, a plaintiff cannot defeat a motion for summary judgment by

simply responding with affidavits recanting earlier testimony."); *Guthrie v. U.S. Gov't*, No. 11-

CV-211, 2011 WL 832251, at *3 (S.D.N.Y. Mar. 2, 2011) ("[The] [p]laintiff makes no allegation

that the arresting officer knew, or had reason to know, that the accusations of the complaining

witness were false and therefore fails sufficiently to allege that the officer did not have probable

cause to arrest him.").  Rose did not recant her statement until 2012, (Pl.'s Mem. in Opp'n to

Marchinkowski Ex. S2 (Rose Aff.)), and, as explained above, the undisputed evidence shows

that the statement was not coerced.  Furthermore, Rose provided Defendants with additional

information they did not previously possess, which they were able to independently verify.

(Marchinkowski's 56.1 ¶ 67; Marchinkowski Decl. ¶¶ 40–41.)  Notably, Rose informed

Defendants that Plaintiff previously unsuccessfully tried to have his mother take out insurance

for him in her name, which Defendants confirmed by interviewing the insurance agent who

submitted Janet Berry's application, who stated that Plaintiff brought his mother in to the office

to try to obtain an insurance policy, and further corroborated by Silvernail's statement that

Plaintiff told him that he could not get insurance in his name due to his debt, and would get it in

his mother's name.  (Marchinkowski's 56.1 ¶ 67; Marchinkowski Decl. ¶¶ 40–41; Pl.'s Mem. in

Opp'n to Marchinkowski Ex. L (Handwritten Sworn Statement of Rodney Silvernail), at 1–2; Posner Aff. Ex. F (Statement of Leslie Brussel-Smith).)

Furthermore, the conduct by Locke and Marchinkowski in their interview of Rose did not amount to coercion as a matter of law. "Whether a statement was voluntary depends not on a single factor, but upon an 'examin[ation of] all of the circumstances surrounding the interrogation to see if police overreaching overcame a suspect's will and led to an involuntary' statement." *United States v. Abu Ghayth*, 945 F. Supp. 2d 511, 515 (S.D.N.Y. 2013) (quoting *Weaver v. Brenner*, 40 F.3d 527, 536 (2d Cir. 1994)); *see also United States v. Vado*, — F. Supp. 3d —, 2015 WL 265432, at *7 (S.D.N.Y. Jan. 20, 2015) (same). A number of circumstances may support a finding of involuntariness, including the "youth of the accused, [her] lack of education, or [her] low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of food or sleep." *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (internal quotation marks removed) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (citations omitted)); *see also Vado*, 2015 WL 265432, at *7 (same); *Abu Ghayth*, 945 F. Supp. 2d at 515 (noting circumstances relevant to voluntariness inquiry include the characteristics of the accused, the interrogation conditions, and police's conduct).

Here, all factors point to the voluntariness of Rose's statement. First and foremost, there is no dispute that Rose was advised of her *Miranda* rights, signed a form waiving those rights, and chose to continue with the interview. (Marchinkowski's 56.1 ¶ 62; Marchinkowski Decl. ¶ 34; Marchinkowski Decl. Ex. R (Rose's *Miranda* Waiver).) This, in and of itself, is highly probative of voluntariness, and Rose makes no assertion that she was coerced into signing the waiver. *See Missouri v. Seibert*, 542 U.S. 600, 608–09 (2004) ("[G]iving the warnings and

getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver."); *Oregon v. Elstad*, 470 U.S. 298, 318 (1985) ("The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative."); *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.").  Second, Rose was at the station for a total of one to one and one-half hours, (Rose Tr. 224–25), significantly less time than other interrogations found to be non-coercive.  *See Saunders v. Lavalley*, No. 10-CV-5896, 2014 WL 2624763, at *16 (S.D.N.Y. June 10, 2014) (collecting cases holding that interrogations lasting from two to three hours were not coercive); *Harris v. Woods*, No. 05-CV-5582, 2006 WL 1140888, at *30 (S.D.N.Y. May 1, 2006) (collecting cases holding that interrogations in the two to two and one-half hour range were not coercive), *adopted by* 2006 WL 1975990 (S.D.N.Y. July 10, 2006).  Third, it was also not coercive as a matter of law to tell Rose that she "[has] a son to think about" and that she was "going to be fingerprinted and booked," (Rose Tr. 197–202 (internal quotation marks removed)), since there was also probable cause to arrest Rose.  *See United States v. Barro*, No. 12-CR-160, 2013 WL 3992405, at *8 (E.D.N.Y. Aug. 2, 2013) ("Informing a defendant of the penalties [she] faces is not coercive . . . . [The agent's] statement of the fact that he would have to call Child Protective Services for [the defendant's] child if both [the defendant] and his wife were arrested is also not coercive." (citations omitted)); *United States v. Garcia*, No. 09-CR-330, 2011 WL 6010296, at *5 (E.D.N.Y. Nov. 30, 2011) ("The mere fact that [an agent] told [the] [d]efendant, if both he and his wife were incarcerated, then

his children would have to be turned over to a responsible adult or Administration for Children's Services, does not constitute coercion."). Nor was it coercive for Defendants to express disbelief about Rose's story by saying, "[n]o, no" to her answers. (Rose Tr. 197–202.) *See Colon v. Ercole*, No. 09-CV-5168, 2010 WL 9401, at *34 (S.D.N.Y. Jan. 4, 2010) ("Merely expressing disbelief or even informing an individual that he or she is a suspect does not necessarily amount to a custodial interrogation."), *adopted by* 2010 WL 3767079 (S.D.N.Y. Sept. 27, 2010); *Vega v. Artuz*, No. 97-CV-3775, 2002 WL 252764, at *11 (S.D.N.Y. Feb. 20, 2002) (holding that expressing skepticism or telling someone not to lie does not amount to custodial interrogation).

Finally, even assuming that Rose's statement was false and that Defendants should have known as much, Defendants nonetheless would have had probable cause to arrest Plaintiff, even setting aside Rose's statement in its entirety. Disregarding Rose's statement, Defendants still had independent information that Plaintiff's previous insurance policy was canceled due to approximately $24,000 in debt. (Marchinkowski's 56.1 ¶ 42; Marchinkowski Decl. ¶ 9; *see also* Marchinkowski Decl. Ex. C (Print Outs from the NYSIF System); *see also* Marchinkowski Decl. Ex. B (Division of Confidential Investigations Investigation Request).) They knew that the scope of work for Desormier's performance of the Alexander contract was spelled out on letterhead that contained only Plaintiff's name, and did not include Rose's name, and contained the same office/fax and cell phone numbers as were previously on the letterhead of ICS, Plaintiff's former company. (Marchinkowski's 56.1 ¶¶ 48–49; Marchinkowski Decl. ¶¶ 15–17.) They further had sworn statements from Silvernail that Plaintiff was using Desormier's insurance policy to conduct his own personal work, as he could not get insurance in his own name due to "bad [debt]," (Marchinkowski Decl. Ex. I (Typed Sworn Statement of Rodney Silvernail)), and that Plaintiff also told him he could not get the policy in his own name, so he would get it in his

mother's name, and then provided a policy in the name of Desormier Contracting, (*see* Pl.'s

Mem. in Opp'n to Marchinkowski Ex. L (Handwritten Sworn Statement of Rodney Silvernail),

at 1–2).  Finally, Defendants had information from Brussel-Smith, whose agency did Plaintiff's

initial application for insurance, that she also submitted both Janet Berry's and Rose's

application, and that Plaintiff went with his mother to apply for the insurance policy.

(Marchinkowski's 56.1 ¶ 67; Marchinkowski Decl. ¶¶ 40–41; Posner Aff. Ex. F (Statement of

Leslie Brussel-Smith).)  Thus, even without Rose's statement, there was more than sufficient

information to establish probable cause to arrest Plaintiff.

Plaintiff also argues that Defendants knew that Plaintiff filed for bankruptcy in June 2006

and his debt was discharged in September 2006, before his arrest in December 2006.  (*See* Pl.'s

Mem. in Opp'n to Marchinkowski Ex. D (Discharge of Debtor), at 1.)  With regard to Plaintiff's

bankruptcy-related claims, as noted above, "[o]nce a police officer has a reasonable basis for

believing there is probable cause, he is not required to . . . eliminate every theoretically plausible

claim of innocence before making an arrest."  *Widget*, 2013 WL 1104273, at *6 (internal

quotation marks omitted).  "The crucial question then, is whether the arresting officers

deliberately disregarded facts known to them which established" a defense.  *Id.*

Here, Locke and Marchinkowski have put forth unrefuted evidence, namely their

deposition testimony, that they did not know about Plaintiff's bankruptcy proceedings, as well as

evidence that the notice of the bankruptcy proceedings was not sent to the places where either

Locke or Marchinkowski worked and that they did not have access to this information.

(Marchinkowski's Reply 18–19; *see also* Marchinkowski Decl. ¶¶ 2–3; Berry Aff. in Opp'n to

Marchinkowski Ex. 4 (Marchinkowski Tr.), at 18, 71, 73–75; Berry Aff. in Opp'n to Locke Ex. 3

(Locke Tr.), at 40–41; Locke's Reply 5.)[14]  Plaintiff argues that the NYSIF and the Dutchess County Sheriff's Office were properly served with reference to the bankruptcy, (*see* Pl.'s Mem. in Opp'n to Locke 9), but he provides no citation to any evidence that would indicate that either Locke or Marchinkowski knew about the bankruptcy, especially where the undisputed evidence shows that the bankruptcy notice was not sent to Defendants or to the offices in which they worked.

Additionally, Plaintiff asserts in his Memorandum, "Detective Locke was told personally by Robert Berry that he had filed bankruptcy, and his response was 'I didn't care and just wanted to get this over and get on with his day.'" (*Id.* at 9–10; *see also id.* at 16 ("Robert Berry called immediately (being approximately 4:30 pm) and spoke to the detective.  Detective Lock[e] demanded that he come to the station and turn himself in.  Robert Berry asked him why and the detective stated for Grand Larceny of $24,000.00 to the New York State Insurance Fund.  Robert responded with 'I went bankrupt.'  Detective Locke was not interested in any explanations regarding Mr. Berry's innocence.").)  Although this assertion is not supported by any citation to the record, and Plaintiff's unsworn Memorandum of Law is unsworn, the Court will nonetheless consider it because it is based on Plaintiff's personal knowledge, and in light of the special solicitude due to pro se parties in opposing summary judgment.  *See, e.g.*, *Shepherd v. Fischer*, No. 10-CV-1524, 2015 WL 1246049, at *8 n.22 (N.D.N.Y. Feb. 23, 2015) ("Although the

---

[14] Included on the list of creditors to be served were the Dutchess County Sheriff- Civil, 150 North Hamilton St., PO Box 389, Poughkeepsie, NY 12601 and New York State Ins. Fund, PO Box 4788, Syracuse, NY 13221-4788.  (*See* Pl.'s Mem. Opp'n to Marchinkowski Ex. D (Discharge of Debtor), at 34–35.)  However, Marchinkowski works in a different office in Albany, (*see* Marchinkowski's Reply 18–19; *see also* Marchinkowski Decl. ¶¶ 2–3; Berry Aff. in Opp'n to Marchinkowski Ex. 4 (Marchinkowski Tr.), at 18, 71, 73–75), and Locke works in the Criminal Division of the Dutchess County Sheriff's Office, which has a different computer system than the Civil Division, (*see* Locke's Reply 5; Berry Aff. in Opp'n to Locke Ex. 3 (Locke Tr.), at 40–41).

allegations are contained in [the] plaintiff's unsworn memorandum of law in support of his opposition, courts in this circuit routinely consider such statements in connection with a motion for summary judgment where the proponent of the statements is a pro se litigant, mindful of the duty to extend special solicitude to those individuals."), *adopted by* 2015 WL 1275298 (N.D.N.Y. Mar. 18, 2015); *Hamm v. Hatcher*, No. 05-CV-503, 2013 WL 71770, at *7 (S.D.N.Y. Jan. 7, 2013) (considering unsworn statements in pro se plaintiff's memorandum of law, but "only to the extent that they are based on personal knowledge or supported by other admissible evidence in the record").  Finally, as evidence of the fact that Locke and Marchinkowski knew of the bankruptcy proceeding, Plaintiff points to Rose's deposition.  Here, Plaintiff does provide some evidence that Locke and Marchinkowski asked Rose about Plaintiff's bankruptcy, thus implying that they knew he had filed for bankruptcy.  First, Plaintiff submits an Affidavit signed by Rose, dated October 16, 2012.  That Affidavit states: "[Marchinkowski and Locke] also kept stating throughout the questioning 'Did you know he went bankrupt?'"  (Pl.'s Mem. in Opp'n to Marchinkowski Ex. S2 (Rose Aff.).)  However, in the deposition, when Rose was pressed on this issue, she said that Marchinkowski and Locke merely asked her about the $24,000.00, and that that does not have anything to do with the bankruptcy.  (Rose Tr. 213–14.)  Therefore, there is a factual question, albeit one with very weak evidence on Plaintiff's side, about whether Marchinkowski and Locke asked Rose about the bankruptcy, and thus whether they knew about it prior to the arrest.

However, with respect to the false arrest claim, the question about whether Defendants knew about Plaintiff's bankruptcy is immaterial.  As explained above, when considering whether there is probable cause or arguable probable cause for arrest, there only must have been arguable probable cause that *a* crime had been committed.  Thus, even if the knowledge of the bankruptcy

proceeding undercut probable cause for the larceny charge, as Plaintiff argues, it still says nothing about probable cause to arrest under § 114(1) of the Workers' Compensation Law discussed above.  Therefore, both Locke and Marchinkowski's Motions for Summary Judgment are granted as to the false arrest claim.

### 3.  Malicious Prosecution

Plaintiff separately brings a malicious prosecution claim.  (Third Am. Verified Compl. ¶¶ 34–41 (Dkt. No. 65).)  "While the tort of malicious prosecution protects against the consequences of wrongful prosecution, public policy favors bringing criminals to justice, and accusers must be allowed room for benign misjudgments."  *Smith-Hunter v. Harvey*, 734 N.E.2d 750, 752 (N.Y. 2000).  "The law therefore places a heavy burden on malicious prosecution plaintiffs . . . ."  *Id.*  Under New York law, "[t]he elements of a malicious prosecution claim . . . are '(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor.'"  *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (quoting *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999)).  "In order to allege a cause of action for malicious prosecution under § 1983, [Plaintiff] must assert, in addition to the elements of malicious prosecution under state law, that there was (5) a sufficient post-arraignment liberty restraint to implicate [] [P]laintiff's Fourth Amendment rights."  *Id.*  Defendants dispute that Plaintiff has sufficient evidence to support the first four elements.

### a.  Initiation of the Prosecution

Marchinkowski and Locke both contend that they cannot be found to have initiated the prosecution because of the intervening authorization of the DA's Office.  (Charles Locke's Mem.

of Law in Supp. of Summ. J. 18–19 (Dkt. No. 132); Mem. of Law in Supp. of Def. Stanley

Marchinkowski's Mot. for Summ. J. 20–21 (Dkt. No. 138).)  Under New York law, criminal

actions can be commenced in several ways.  "[I]f there has been no indictment, a criminal action

is commenced by the filing of an accusatory instrument, to wit, a 'felony complaint' for a felony

charge, or a 'misdemeanor complaint' or an 'information' for a misdemeanor charge."  *Murphy*

*v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997) (citations omitted).  The action against Plaintiff

proceeded by felony complaint.  (*See* Marchinkowski Decl. Ex. V (Felony Complaint).)

Additionally, the evidence shows that, before commencing the arrest, Locke ran it by the District

Attorney "[i]n a very vague manner."  (Berry Aff. in Opp'n to Locke Ex. 3 (Locke Tr.), at 24.)

      With respect to Locke, it is undisputed that he swore out the felony complaint, the

accusatory instrument brought against Plaintiff.  (*See* Marchinkowski Decl. Ex. V (Felony

Complaint).)  Therefore, a jury could decide that Locke initiated the prosecution.  *See Cameron*

*v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("Under New York law, police officers can

'initiate' prosecution by filing charges or other accusatory instruments. . . . As a matter of law,

[the defendant police officers'] filing of the Criminal Court Complaint 'initiated' the prosecution

against [the plaintiff].");  *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("[A]

jury could clearly find that [a police lieutenant] started the assault prosecution because no one

disputes that he started the prosecution by filing the charges of second-degree assault.");

*Rounseville v. Zahl*, 13 F.3d 625, 628 (2d Cir. 1994) ("There is no dispute that the defendants

swore out an accusatory instrument, which would appear under New York law to satisfy the

requirement that the defendants' initiated a criminal proceeding against the [plaintiffs].");  *Bonds*

*v. City of New York*, No. 12-CV-1772, 2014 WL 2440542, at *6 (E.D.N.Y. May 30, 2014)

("When asserting a malicious prosecution claim against a law enforcement officer, a plaintiff

must overcome the presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding.  Courts have frequently found this element of a malicious prosecution claim can be satisfied where, as here, the law enforcement officer filed the criminal complaint." (citation and internal quotation marks omitted)); *Minott v. Duffy*, No. 11-CV-1217, 2014 WL 1386583, at *16 (S.D.N.Y. Apr. 8, 2014) ("[I]t is well-established that a criminal complaint filed by a police officer can serve as the initiating act for malicious prosecution purposes."); *Struthers v. City of New York*, No. 12-CV-242, 2013 WL 2390721, at *10 (E.D.N.Y. May 31, 2013) ("With respect to [one defendant police officer], it is undisputed that he swore out the criminal complaint charging [the plaintiff] with assault[] and harass[ment] . . . . This action alone is sufficient to satisfying the first element [of initiation of the prosecution].").  Therefore, summary judgment is inappropriate as to Locke on this ground.

Marchinkowski, however, did not bring formal charges, fill out a complaining or corroborating affidavit, or swear to or sign a felony complaint.  Nor is there any evidence that he created false information and gave it to prosecuting authorities.  Furthermore, there is no evidence that he induced Locke to bring the criminal charges.  Thus, there is no evidence that can create a material issue of fact as to whether Marchinkowski initiated the prosecution, and he is therefore entitled to summary judgment on this claim.  *See Bonds*, 2014 WL 2440542, at *6 (denying summary judgment on malicious prosecution claim as to officer who signed the criminal complaint, but granting it as to the other officer who investigated the crime because the "record does not show that [he] had any role in [the] plaintiff's prosecution or any of the events following his arrest"); *Hart v. City of New York*, No. 11-CV-4678, 2013 WL 6139648, at *6 n.4 (S.D.N.Y. Nov. 18, 2013) (noting, in granting a motion for summary judgment that the plaintiff "failed to submit any evidence" demonstrating that the defendant police officers took any actions

that have been found to create a "triable issue of fact," and holding that speaking with the prosecutor responsible for the case is insufficient (internal quotation marks omitted)); *Struthers*, 2013 WL 2390721, at *10, *18 (denying summary judgment for police officer who swore out the criminal complaint, but granting it to the other police officers, including the one who provided the information the complaint was based on because "[t]here [was] no record evidence that any police officer other than [the one who swore out the complaint] was involved in the prosecution"); *Carter v. Port Auth. of N.Y. & N.J*, No. 03-CV-8751, 2004 WL 2978282, at *8 (S.D.N.Y. Dec. 20, 2004) (holding that two officers "initiated and continued criminal process against [the plaintiff] by swearing out the complaining and corroborating affidavits to initiate[] the case and being available as witnesses to continue the case," but granting summary judgment as to a third officer who filled out a witness statement against the plaintiff because the statement "was not one of the required documents to initiate criminal process," and therefore a "jury could not conclude that [he] was responsible for the initiation or continuation of criminal process against the plaintiff"); *cf. Chimurenga v. City of New York*, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999) (noting that providing truthful information and evidence to prosecuting authorities is not a sufficiently active role in initiating or prosecuting the charges to be held liable).

### b.  Favorable Termination

Next, to bring a malicious prosecution charge, Plaintiff must establish that the prosecution was terminated in his favor.  Petitioner's case was terminated on January 15, 2009 pursuant to N.Y. C.P.L. §§ 180.85(2)–(3).  (*See* Posner Aff. Ex. W (Decision and Order Terminating Prosecution).)  N.Y. C.P.L. § 180.85 was put in place in 2004 to "partially close[] a technical gap in criminal procedure."  *People v. Hassim*, No. 017841C–2010, 2011 WL 2536211, at *1 (Sup. Ct. 2011) (internal quotation marks omitted).  As one court explained,

> Essentially, the basic problem was that after a defendant's arraignment on a felony complaint in a local criminal court, the papers were transferred to the superior court, divesting the local criminal court of jurisdictional authority. Consequently, the matter would remain in limbo until the People presented the case to a grand jury, often well beyond the six[-]month speedy trial requirement for the People's announcement of readiness. Because the superior court had no statutory or supervisory authority to dismiss the felony complaint, the charge(s) remained in suspension, burdening defendant with the impediment of a pending felony charge.

*Id.* (citations omitted). Section 180.85 provides that if a defendant is arraigned upon a felony complaint, other than for certain offenses, and if the count or counts have not been presented to a grand jury within twelve months of the date of the arraignment, a party can file a motion to dismiss the indictment. *See* N.Y. Crim. Proc. Law §§ 180.85(1)–(3). On consent, the charges will be dismissed. *Id.* § 180.85(3). However, "[w]here a prosecution is terminated pursuant to this section, nothing . . . shall preclude the people from subsequently filing an indictment charging the same count or counts provided such filing is in accordance with the provisions of this section, article thirty and any other relevant provisions of this chapter." *Id.* § 180.85(7).

Under New York law, a plaintiff need not "demonstrate innocence in order to satisfy the favorable termination prong of the malicious prosecution action;" rather, the disposition must not be "inconsistent with innocence." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 200–01 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Smith-Hunter*, 734 N.E.2d at 755). Generally, under New York law, for a termination to be favorable it must be *final*, such that "the proceeding cannot be brought again." *Smith-Hunter*, 734 N.E.2d at 753. That is, "a criminal proceeding is terminated favorably to the accused when 'there can be no further proceeding upon the complaint or indictment, and no further prosecution of the alleged offense.'" *Id.* (quoting *Robbins v. Robbins*, 30. N.E. 977, 978 (1892)). "Indeed, it is well settled that any disposition of the criminal action which does not terminate it but permits it to be renewed cannot serve as a foundation for the malicious prosecution action." *Id.* at 754 (alterations, citation, and internal

55

quotation marks omitted).  There are two reasons behind this policy.  "First, it cannot be known that the prosecution was unjust or unfounded until it is terminated.  Second, if a malicious prosecution action is allowed to proceed before the final termination of the underlying action, there might be two conflicting determinations as to the same transaction."  *Id.* (citations and internal quotation marks omitted).  However, "[a] dismissal without prejudice qualifies as a final, favorable termination if the dismissal represents the formal abandonment of the proceedings by the public prosecutor, for instance, by the entry of a *nolle prosequi*."  *Id.* (citations and internal quotation marks omitted).

The Parties have offered no case, state or federal, analyzing whether a dismissal pursuant to § 180.85 can constitute or always constitutes a final favorable termination for malicious prosecution purposes.  Here, § 180.85 explicitly provides that a prosecution terminated pursuant to that section may be reinstituted, subject to compliance with other New York rules of criminal procedure.  N.Y. Crim. Proc. Law § 180.85(7).  The question is whether the decision not to renew the charges or the fact that the DA's Office would have been barred from renewing charges can turn a § 180.85 dismissal into a final and favorable termination.  Most instructive here is *Rogers v. City of Amsterdam*, 303 F.3d 155 (2d Cir. 2002), which was decided before § 180.85 was enacted.  In *Rogers*, the plaintiffs were subject to the legal limbo that § 180.85 was designed to eliminate.  Felony prosecutions were brought in local criminal court, which had no jurisdiction to dispose of the felony complaint.  *Id.* at 160 n.1.  No indictments were brought, and therefore the superior court did not have jurisdiction to dismiss the complaint.  *Id.*  However, dismissal was warranted on speedy trial grounds, N.Y. C.P.L. § 30.30, because no action had been taken in four years since the filing of the criminal complaint.  *Id.* at 160.  Therefore, the "plaintiffs ha[d] no forum to obtain a formal dismissal of the underlying criminal action even

though such a dismissal [was] preordained." *Id.* at 160 n.1.  The Second Circuit held that because "any attempt . . . by the [defendant] to proceed with criminal action against [the plaintiff] [would] necessarily result in a dismissal pursuant to New York Criminal Procedure Law § 30.30," there was "no relevant distinction between this case and *Smith-Hunter*" and that "due to the [defendant's] abandonment of the criminal action, it [had] been constructively dismissed." *Id.* at 160–61.  Although the posture of this case is different because here the charges were dropped due under § 180.85, the Court finds the reasoning of *Rogers* instructive.

Section 180.85(7) provides that charges dismissed under that § 180.85(7) can only be renewed if doing so would be permitted under Article 30 of the New York Criminal Procedure Law.  N.Y. Crim. Proc. Law § 180.85(7).  Therefore, the Court must answer two questions in applying these two provisions to this case.  First, if the DA's Office tried to bring the same charges in the Complaint against Plaintiff, would they necessarily be dismissed under Article 30?  Second, if so, would such a dismissal constitute a favorable termination for malicious prosecution grounds?

For the purposes of speedy trial calculations, a criminal action "commences with the filing of an accusatory instrument against a defendant in a criminal court," and "includes the filing of all further accusatory instruments directly derived from the initial one," and "terminates with the imposition of sentence or some other final disposition in a criminal court of the last accusatory instrument filed in the case."  N.Y. Crim. Proc. Law § 1.20(16).  A later accusatory instrument is "directly derived" when "the indictment can be traced to or originates from the prior accusatory instrument."  *People v. Farkas*, 944 N.E.2d 1127, 1129 (N.Y. 2011) (internal quotation marks omitted).  Here, if the dismissed charges were renewed, they would be directly derived from the previous complaint and the speedy trial clock from the first complaint would

begin to run again.  *See People v. Osgood*, 417 N.E.2d 507, 509–10 (N.Y. 1980) (holding that the speedy trial clock did not start anew with the filing of indictment of charges directly derived from the previous complaint, which was dismissed on speedy trial grounds).  Thus, the question is whether the speedy trial clock already expired on the previous complaint.  The Court has insufficient evidence to determine whether the speedy trial clock expired in this case.  Because the movants have the burden of persuasion, and Defendants did not meet this burden here, the Court assumes that the case would be barred under § 30.30 if the charges were renewed.

Under New York law, a dismissal under N.Y. C.P.L. § 30.30 generally constitutes a favorable disposition for malicious prosecution purposes.  *See Smith-Hunter*, 734 N.E.2d at 753 (reasoning that a § 30.30 dismissal is generally favorable because "there can be no further prosecution of the offense").  However, the New York Court of Appeals also has recognized that "there may be instances where a malicious prosecution defendant can show that the circumstances surrounding a CPL 30.30 dismissal are inconsistent with a plaintiff's innocence." *Id.* at 755–56.  In particular, the Court of Appeals noted that dismissal may not form the basis of a malicious prosecution claim if it is dismissed because of misconduct on the part of the accused or if the charges were withdrawn as part of a compromise or out of mercy to the accused.  *Id.* at 753–54; *see also Rothstein v. Carriere*, 373 F.3d 275, 286–87 (2d Cir. 2004); *Cantalino v. Danner*, 754 N.E.2d 164, 167 (N.Y. 2001).  This case does not fit into any one of these exceptions, and Defendants do not identify any case in which an inadvertent error by the prosecutors leading to a speedy trial dismissal can constitute an exception to New York's general rule that a speedy trial violation is a favorable termination, nor did the Court find any case so holding.  Therefore, summary judgment is not warranted as to the malicious prosecution claim against Locke on this basis.

<u>c.  Probable Cause and Malice</u>

Defendants spill much ink on the lack of evidence of malice on the part of Locke and Marchinkowski.  The Court agrees with Defendants that there is no direct evidence of malice by Locke and Marchinkowski.  However, it is clear that, in the Second Circuit, a jury may infer malice from the absence of probable cause.  *See, e.g.*, *Ricciuti*, 124 F.3d at 131 ("[L]ack of probable cause generally raises an inference of malice sufficient to withstand summary judgment.  In the present case . . . a jury could find that probable cause for the charges against the plaintiffs was lacking, and that finding alone would support an inference of malice." (citation omitted)); *Franks v. City of New York*, No. 13-CV-5358, 2015 WL 3533721, at *8 (E.D.N.Y. June 4, 2015) ("[T]he caselaw is clear that a jury can infer malice from the lack of probable cause."); *Weiner v. McKeefery*, — F. Supp. 3d —, 2015 WL 1055890, at *13 (E.D.N.Y. Mar. 11, 2015) ("[B]ecause the existence of probable cause to prosecute remains in question, the existence of actual malice does as well."); *Lovitch v. Lovitch*, No. 11-CV-2536, 2015 WL 1047807, at *7 (S.D.N.Y. Mar. 10, 2015) ("A jury may infer the existence of actual malice from the absence of probable cause." (internal quotation marks omitted)); *Abdell v. City of New York*, No. 05-CV-8453, 2014 WL 3858319, at *2 (S.D.N.Y. Aug. 5, 2014) (emphasis omitted) ("[I]t is long-settled that the lack of probable cause may give rise to an inference of malice." (internal quotation marks omitted)); *Brink v. Muscente*, No. 11-CV-4306, 2014 WL 4810329, at *7 (S.D.N.Y. Sept. 23, 2014).  Thus, the question of whether there is an issue of material fact with respect to the malice element is inherently tied up with the question of whether there was probable cause to prosecute Plaintiff for the crimes with which he was charged.

"As with false arrest claims, 'the existence of probable cause is a complete defense to a claim of malicious prosecution in New York,' but unlike false arrest claims, the defendant must

have possessed probable cause as to each offense charged." *Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014) (citations omitted) (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)); *see also Jean-Laurent v. Hennessy*, No. 05-CV-1155, 2008 WL 3049875, at *8 n.14 (E.D.N.Y. Aug. 1, 2008) ("The Court recognizes that a plaintiff's conviction on one offense does not automatically bar a malicious prosecution claim for other offenses that were terminated in [the] plaintiff's favor."); *cf. Manganiello v. City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010) ("The existence of probable cause is a complete defense to a claim of malicious prosecution in New York." (internal quotation marks and alterations omitted)).  In particular, where an officer has probable cause or arguable probable cause for a lesser offense, the existence of that probable cause does not bar a malicious prosecution claim on a greater offense.  *See Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991) ("[W]e should not allow a finding of probable cause on . . . [a disorderly conduct] charge to foreclose a malicious prosecution cause of action on charges requiring different, and more culpable, behavior. . . . [Under the opposite rule,] an officer with probable cause as to a lesser offense could tack on more serious, unfounded charges which would support a high bail or a lengthy detention, knowing that the probable cause on the lesser offense would insulate him from liability for malicious prosecution on the other offenses."); *Johnson v. New York City*, No. 12-CV-4379, 2013 WL 950870, at *1 (S.D.N.Y. Mar. 7, 2013) ("[T]he Second Circuit requires the Court to separately analyze the charges claimed to have been maliciously prosecuted." (internal quotation marks omitted)), *aff'd sub nom. Johnson v. City of New York*, 551 F. App'x 14 (2d Cir. 2014); *Davis v. City of New York*, 373 F. Supp. 2d 322, 334 (S.D.N.Y. 2005) ("Since there are two distinct charges underlying the prosecution at issue here, the [c]ourt must separately analyze the charges claimed to have been maliciously prosecuted." (internal quotation marks omitted)).

As with a false arrest claim, "[i]n the context of a malicious prosecution claim, probable cause under New York law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Rounseville*, 13 F.3d at 629 (internal quotation marks omitted). Additionally, probable cause is measured at the time of the judicial proceeding, not the time of the arrest, though if it existed at the time of the arrest "it continues to exist at the time of prosecution unless undermined by the discovery of some intervening fact." *Costello*, 20 F. Supp. 3d at 415.

Plaintiff was charged with three crimes: grand larceny in the third degree in violation of § 155.35 of the New York Penal Code, offering a false instrument for filing in the first degree, in violation of § 175.35 of the New York Penal Code, and committing a fraudulent practice in violation of § 114(3) of the New York Workers' Compensation Law.[15]  (Marchinkowski Decl. Ex. V (Felony Complaint).)  N.Y. Penal Law § 175.35(1) provides:

---

[15] The Court notes that Plaintiff raises a general argument that there could not have been probable cause for any of the charges because Locke lied about having personal knowledge when he swore out the felony complaint and therefore there was no probable cause to charge him. (*See, e.g.*, Pl.'s Mem. of Law in Supp. of Opp'n to Defs.' Summ. J. Mot. to Dismiss 3 (Dkt. No. 162).)  However, it is clear from the complaint that Locke stated that there were several sources for his knowledge.  In particular, the complaint stated:

> The foregoing factual allegations are based upon personal knowledge of the complainant and upon information and belief, the sources of complainant's information and belief being, depositions of Richard Morrison, Ann Froman, Rodney Silvernail, Russell DeForest, voluntary statement of Marcia Rose, applications of insurance by Robert Berry and Marcia Rose, audits conducted by the New York State Insurance Fund, written estimates of 'Desormier Contracting' written by Robert Berry, banking records of []Desormier Contracting, and investigation by Stan Marchinkowski of the New York State Insurance Fund and the Dutchess County Sheriff's Office.

(Marchinkowski Decl. Ex. V (Felony Complaint).)  Thus, it is simply not the case that Locke lied that he had personal knowledge of the facts creating probable cause, and Locke was allowed to

> A person is guilty of offering a false instrument for filing in the first degree when[,] knowing that a written instrument contains a false statement or false information, and with intent to defraud the state or any political subdivision, public authority or public benefit corporation of the state, he or she offers or presents it to a public office, public servant, public authority or public benefit corporation with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become a part of the records of such public office, public servant, public authority or public benefit corporation.

Moreover, New York Penal Law § 20.20 states: "When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct."  N.Y. Penal Law § 20.20.

Here, Defendants had probable cause, and certainly arguable probable cause, to believe that Rose violated § 175.35(1), and that Plaintiff could be held liable under § 20.20 for soliciting her commission of the crime.  The evidence in Defendants' possession at the time charges were brought showed that Rose violated that provision by creating Desormier Contracting and submitting an insurance application representing that Rose had never been insured in the New York State Insurance Fund where the application clearly stated:

> You must answer "YES" if you or any person who directly or indirectly owns or controls or is the president, vice president, secretary or treasurer of [ICS] either

---

rely on the other sources referred to in order to make a probable cause determination.  *See, e.g.*, *Loria v. Gorman*, 306 F.3d 1271, 1289–90 (2d Cir. 2002) (holding that, even if the officer who wrote a warrant application "falsely stated that the allegations in the warrant application were based on his personal knowledge," the malicious prosecution claim would still fail because the corrected affidavit, which would say that the officer "had been informed by . . . an identified citizen witness" of the events in question, "would be sufficient as a matter of law to support probable cause"); *Thornton v. City of Albany*, 831 F. Supp. 970, 987 (N.D.N.Y. 1993) (holding that an officer need not "rely solely upon his own personal observations," but rather, "'may rely upon information received through [a third party], rather than upon his direct observations, so long as the [third party's] statement is reasonably corroborated by other matters within the officer's knowledge'" (alterations in original) (some internal quotation marks omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 242 (1983))).

> directly or indirectly owns or controls or is president, vice president, secretary or
> treasurer of an employer that has had a workers' compensation policy with the State
> Insurance Fund that was cancelled, or directly or indirectly owned or controlled or
> was president, vice president, secretary or treasurer of an employer at the time that
> employer's workers' compensation insurance policy with the State Insurance Fund
> was cancelled.   The Workers' Compensation Law prohibits any person from
> contracting for a subsequent policy with the State Insurance Fund while the billed
> premium on such a cancelled policy remains uncollected.

(Posner Aff. Ex. J (Marcia Rose NYSIF Application), at 3.)  In particular, at the time that

charges were brought, Defendants had Rose's statement that Plaintiff discussed with her that he

could not take out a policy in his name because of the $24,000 in NYSIF debt, and that she

therefore agreed to take out a policy in her name to allow Plaintiff to perform work on the

Alexander project.  (*See* Marchinkowski Decl. Ex. S (Rose Signed Statement), at 1.)  Indeed,

Defendants had information that the Rose application was Plaintiff's second attempt to

circumvent the application process to acquire insurance without paying his delinquent debt.  (*See*

*id.*)  In the statement, Rose also said that she "never had any active participation in the company

whatsoever such as estimates, billing, actual physical labor, or scheduling appointments," and

that she "knew the only reason [her] name was needed to take out the policy was that Robert

Berry was unable to use his name due to the previous monies owed."  (*Id.* at 2)  This statement

was corroborated by other evidence in Defendants' possession at the time the charges were

brought, for example, that: (1) the July 5, 2005 Alexander estimate was on Plaintiff's letterhead,

(2) Plaintiff submitted the building permit application dated September 26, 2005, which listed

Desormier as the contractor, (3) the scope of work for the Alexander project dated September 29,

2005 was on letterhead of Desormier Contractors/Robert D. Berry.  (Marchinkowski's 56.1 ¶ 46;

Marchinkowski Decl. ¶ 14.)  Additionally, Marchinkowski noted the similarities between the

letterhead used for the July 5 estimate and the September 29 scope of work for the Alexander

project, noting that the office/fax and cell phone numbers were the same, that Berry had

previously identified the fax number used as belonging to ICS, and that Berry was the only name listed on Desormier's letterhead, despite Rose stating that she was the sole proprietor of Desormier.  (Marchinkowski's 56.1 ¶¶ 48–49; Marchinkowski Decl. ¶¶ 15–17.)  This evidence plainly established probable cause to warrant Defendants thinking that Plaintiff violated N.Y. Penal Law § 175.35.  *See People v. Thompson*, 823 N.Y.S.2d 112, 113 (App. Div. 2006) (upholding conviction under § 175.35 because "[t]he defendant's intent to defraud the New York State Insurance Fund (hereinafter SIF) could be inferred from his failure to disclose his work for his own business on questionnaire forms which he was periodically required to fill out and file with SIF as a condition for receiving continued benefits from SIF"); *cf. People v. Scutt*, 796 N.Y.S.2d 816, 817 (App. Div. 2005) ("The requisite intent to defraud may be inferred from the fact that defendant indicated on the recertification form that his daughter resided with him when he knew that she did not.").  Thus, the Court grants both Defendants' Motion for Summary Judgment as to the malicious prosecution claim based on Plaintiff being charged with N.Y. Penal Law § 175.35(1).

> With regard to the second charge, N.Y. Workers' Compensation law § 114(3) provides:

> A person who knowingly makes a false statement or representation as to a material fact for the purpose of obtaining, maintaining or renewing insurance under this chapter, whether for himself or herself or for any other person or entity or for the purpose of evading the requirements of section fifty of this chapter shall be guilty of a class E felony.

There is essentially no law—state or federal—that interprets what is required for a conviction under this provision, for example, interpreting to whom the false statement must be made, nor is

there any indication that vicarious liability, for example, accomplice liability, applies to this section.[16]

However, after reviewing the evidence, the Court concludes that Defendants had arguable probable cause to prosecute Plaintiff for violating this provision.  Before bringing the prosecution, Defendants had the following information.  First, they had a sworn statement from Richard Morrison, Manager of Policyholder Services at NYSIF, in which he stated that DeForest conducted several audits of Desormier Contracting that Plaintiff attended and that Plaintiff indicated that he was a friend of the owner.  (*See* Posner Aff. Ex. U (Decl. of Richard Morrison), at 1.)  At the same time, Defendants had substantial evidence that Plaintiff was the *actual* owner of Desormier Contracting and that Plaintiff was using Desormier Contracting as a way to fraudulently get insurance coverage despite the fact that he was ineligible because of his debt.  This evidence included Silvernail's sworn statement that Plaintiff told him that he could not get insurance in his name due to bad debt and that Plaintiff provided Silvernail an insurance certificate in the name of Desormier Contracting.  (Marchinkowski Decl. Ex. I (Sworn Statement of Rodney Silvernail); *see also* Pl.'s Mem. in Opp'n to Marchinkowski Ex. L (Handwritten Sworn Statement of Rodney Silvernail).)  Additionally, as discussed in detail above, Rose provided information to Defendants that Plaintiff was unable to obtain insurance coverage in his own name, so she agreed to take the policy out in her name even though she "never had any active participation in the company whatsoever," and she "knew the only reason [her] name was needed to take out the policy was that [Plaintiff] was unable to use his name due to the previous

---

[16] The Court notes that Locke's discussion of the arguable probable cause for this cause really relies on § 114(1), which refers to "causing" a written statement to be filed.  (Charles Locke's Mem. of Law in Resp. to Order of the Honorable Kenneth M. Karas Dated July 10, 2015 4–5 (Dkt. No. 157).)  However, Plaintiff was not charged with this provision.  (*See* Marchinkowski Decl. Ex. V (Felony Complaint) (invoking only § 114(3)).)

monies owed." (Marchinkowski Decl. Ex. S (Rose Signed Statement), at 2.)  Other evidence Defendants had indicating that Plaintiff was in fact the owner of Desormier was that Desormier's application listed the company's address as 55 Front Street, the same address that Plaintiff lived at, that Desormier's application denied having previous coverage, and that Desormier's application was submitted by the same agency as was Plaintiff's original application, as was Plaintiff's earlier application through his mother.  (Marchinkowski's 56.1 ¶¶ 9, 43–45; Marchinkowski Decl. ¶¶ 10–12, 40.)

    As discussed above, Marchinkowski also reviewed documents provided to DeForest during the audit.  (Marchinkowski's 56.1 ¶ 46; Marchinkowski Decl. ¶ 13; Ex. F (attaching the documents provided during the audit).)  In particular, in reviewing the documents, Marchinkowski noted that: (1) the July 5, 2005 Alexander estimate was on Plaintiff's letterhead, (2) the building permit application dated September 26, 2005 listed Desormier as the contractor and was submitted by Plaintiff, (3) that the scope of work for the Alexander project dated September 29, 2005 was on letterhead stating Desormier Contractors/Robert D. Berry.  (Marchinkowski's 56.1 ¶ 46; Marchinkowski Decl. ¶ 14.)  Additionally, Marchinkowski noted the similarities between the letterhead used for the July 5 estimate and the September 29 scope of work for the Alexander project, that Berry had previously identified the fax number used as belonging to ICS Inc., and that Berry was the only name listed on Desormier's letterhead, despite Rose stating that she was the sole proprietor of Desormier.  (Marchinkowski's 56.1 ¶¶ 48–49; Marchinkowski Decl. ¶¶ 15–17.)  Furthermore, before the prosecution was brought, Defendants learned that Plaintiff had previously transferred ownership of his company to his mother and had her try to take out insurance coverage but was denied because of the previous policy based on the information provided by Rose in the interview, (*see* Marchinkowski Decl. Ex. S (Rose Signed

Statement) ("Robert Berry then attempted to have his mother, Janet Berry, take out a policy with the NYS Insurance Fund for him because he was unable to due to premium owed to the NYS Insurance Fund.  He could not acquire insurance while there was a balance due.  The George. T. Whalen Insurance Company did not accept that policy because the names were the same.")), which they confirmed following the interview with Rose, (Marchinkowski's 56.1 ¶ 67; Marchinkowski Decl. ¶¶ 40–41).  Furthermore, Alexander told Marchinkowski that Berry had problems obtaining insurance coverage and that he ultimately used someone else to get the necessary policy.  (Marchinkowski's 56.1 ¶ 53; Marchinkowski Decl. ¶ 23.)  Based on all of this evidence in Defendants' possession at the time the prosecution was brought, there was certainly arguable probable cause to prosecute Plaintiff for knowingly making a false statement or representation as to a material fact for the purpose maintaining insurance for Desormier Contracting, based on the statement he made to DeForest that he was not the owner of Desormier.  Thus, the Court grants summary judgment as to the malicious prosecution claim based on Plaintiff being charged with N.Y. Workers' Compensation law § 114(3).

Finally, the Court will address whether Defendants had arguable probable cause to prosecute Plaintiff for grand larceny in the third degree under N.Y. Penal Law § 155.35.  That provision provides that a "person is guilty of grand larceny in the third degree when he or she steals property and[] when the value of the property exceeds three thousand dollars."  Under New York law, "[a] person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof."  N.Y. Penal Law § 155.05(1).  There are numerous ways to commit larceny under New York law, including by trespassory taking, common law larceny by trick, embezzlement, obtaining property by false pretenses, and

by false promise.  *Id.* § 155.05(2).  According to the felony complaint, the property involved was

the $24,429.46 in premiums that Plaintiff allegedly wrongfully withheld from NYSIF.

(Marchinkowski Decl. Ex. V (Felony Complaint).)

Both Defendants argue that there was arguable probable cause to charge Plaintiff with

grand larceny based on the evidence that he received $15,000 from Silvernail and Froman to

build the art studio, that he never built it, and that he never returned the money.  (*See* Charles

Locke's Mem. of Law in Resp. to Order of the Honorable Kenneth M. Karas Dated July 10,

2015 1–2 (Dkt. No. 157); Supp. Mem. of Law in Further Supp. of Def. Stanley Marchinkowski's

Mot. for Summ. J. 4 (Dkt. No. 159).)  However, this was not the basis for the felony complaint

and neither Defendant provides any case law suggesting that merely because, assuming

arguendo, Plaintiff could have been charged with grand larceny based on the $15,000 he did not

return to Silvernail and Froman, there was probable cause to charge him with grand larceny

based on his withholding of the $24,000 from NYSIF, a totally unrelated crime.

Nonetheless, Defendants did have arguable probable cause to charge Plaintiff with

larceny based on a theory of false promise or wrongful withholding.  As the New York Court of

Appeals has explained:

> A person obtains property by false promise when, pursuant to a scheme to defraud,
> he obtains property of another by means of a representation, express or implied,
> that he or a third person will in the future engage in particular conduct, and when
> he does not intend to engage in such conduct, or as the case may be, does not believe
> that the third person intends to engage in such conduct.

*People v. Churchill*, 390 N.E.2d 1146, 1150 (N.Y. 1979) (internal quotation marks omitted).

"[T]he mere failure to pay one's debts does not constitute larceny."  *People v. Kozlowski*, 846

N.Y.S.2d 44, 47 (App. Div. 2007), *aff'd*, 898 N.E.2d 891 (N.Y. 2008).  However, "there is rarely

direct proof of intent," and therefore intent "must be inferred from the facts and circumstance."

*People v. Carey*, 479 N.Y.S.2d 789, 790 (App. Div. 1984).  In similar situations, courts have allowed juries to infer that defendants incurred debt with the intention of not repaying it from conduct that exclusively occurred after the debt was incurred, and to convict such defendants beyond a reasonable doubt based on that evidence.  Indeed, "evidence of subsequent or additional fraudulent activity can prove larcenous intent."  *Besser v. Walsh*, No. 02-CV-6775, 2003 WL 22093477, at *18 (S.D.N.Y. Sept. 10, 2003), *adopted by* 2003 WL 22846044 (S.D.N.Y. Dec. 2, 2003).  For example, in *Ponnapula v. Spitzer*, 297 F.3d 172 (2d Cir. 2002), the Second Circuit held that there was sufficient evidence for the jury to reasonably infer that the habeas petitioner had no intent to repay a loan he took out because he knew his resources would be inadequate, he ignored the default notices, and "instead of securing funds to repay the [b]ank, [he] sought loans with other banks for different projects."  *Id.* at 180.  Additionally, in *Besser v. Walsh*, 2003 WL 22093477, the court held that the jury could infer larcenous intent with respect to cashing bad checks at a store when he apologized afterward, but did not repay the money, and extorted money repeatedly from the store thereafter.  *See id.* at *19.

Here, Defendants had evidence that between taking out the ICS policy in April 2003 and its cancellation less than eight months later in November 2004, Plaintiff had run up more than $24,000 in debt to NYSIF.  (Marchinkowski Decl. Ex. S (Rose Signed Statement); Locke's 56.1 ¶ 4; Marchinkowski's 56.1 ¶ 4; Berry Tr. 63–69.)  Defendants further had substantial evidence, as discussed above, that after his policy was cancelled, Plaintiff had his mother and then his girlfriend attempt to take out policies on his behalf.  Moreover, they had evidence that Desormier Contracting owed approximately $5,000 on its policy.  (Marchinkowski's 56.1 ¶ 42; Marchinkowski Decl. ¶ 9; Marchinkowski Decl. Ex. C (Print Outs from the NYSIF System), at unnumbered 2.)  Finally, they had evidence that Plaintiff had been hired to do a project worth

approximately $80,000 and had obtained $15,000 from Froman and Silvernail, but that Plaintiff failed to make any payments on the debt.  (*See* Locke's 56.1 ¶ 5; Marchinkowski's 56.1 ¶¶ 6, 26; Berry Tr. 67, 83–85; Posner Aff. Ex. C (July 5, 2005 Berry Estimate for Alexander); Marchinkowski Decl. Ex. I (Sworn Statement of Rodney Silvernail); (Pl.'s Mem. in Opp'n to Marchinkowski Ex. O, at unnumbered 3.)

 The Court holds that a reasonable officer in Defendants' position had sufficient information to conclude that Plaintiff did not intend to repay the policy at the time he took it out in April 2003 based on his subsequent conduct, and therefore there was arguable probable cause to charge him with larceny by false promise.  The same evidence also provided arguable probable cause to charge Plaintiff with larceny based on a theory of wrongful withholding. Plaintiff's subsequent fraudulent conduct and the fact that Plaintiff had substantial income would allow a reasonable officer to infer Plaintiff's intent to withhold money from NYSIF.  *See People v. Crean*, 454 N.Y.S.2d 943, 946 (Sup. Ct. 1982) ("[L]arceny essentially consists of an intent to steal combined with the actual wrongful taking, obtaining, or withholding of one's property."). Finally, to the extent that there is evidence Defendants knew Plaintiff had filed for bankruptcy, this is not material, as bankruptcy does not discharge fraudulently incurred debt.  *See In re Bogdanovich*, 292 F.3d 104, 107 (2d Cir. 2002) ("Congress made it a central purpose of the bankruptcy code to give debtors a fresh start in life and a clear field for future effort unburdened by the existence of old debts.  This policy is limited to the so-called 'honest debtor,' such that certain debts incurred, for example, by fraud are not dischargeable in bankruptcy."). Accordingly, it is not the case that Defendants only had evidence of Plaintiff failing to repay a debt; rather, Defendants had sufficient evidence of post-conduct actions by Plaintiff that reasonable officers in their position could reasonably believe there was sufficient evidence from

which to infer intent to steal.  Therefore, Defendants' Motions for Summary Judgment are granted as to this charge.

### III.  Conclusion

For the foregoing reasons, Marchinkowski's and Locke's Motions for Summary Judgment are granted.  The Clerk of the Court is respectfully directed to terminate the pending Motions, enter judgment for Marchinkowski and Locke, and to close this case.  (Dkt. Nos. 126, 135.)

SO ORDERED.

Dated:      September 30, 2015
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

71